[Civ. No. 14425.   Second Dist., Div. One.   Jan. 12, 1945.]

Estate of LAURA SCHWARTZ, Deceased.   BERNERD SCHWARTZ, Appellant, v. HAROLD I. SCHWARTZ, as Executor, etc., et al., Respondents.

John J. Beck for Appellant.

Samuel A. Miller for Respondents.

514

WHITE, J.—This is an appeal by the contestant of a will from an order admitting that will to probate after trial of a will contest before the court sitting without a jury.

Laura Schwartz, the deceased, lived at Los Angeles, where she died on December 18, 1942, at the age of seventy-four years. Her sole surviving heirs at law were two sons, Harold I. Schwartz and Bernerd Schwartz. Both sons were married and living with their wives. Phyllis Schwartz is the wife of Harold I. Schwartz and they have as their only issue a daughter, Lois, approximately of the age of eight years. Ethel Schwartz is married to Bernerd Schwartz but they have no issue.

One of the sons, Harold I. Schwartz, offered for probate a document dated June 2, 1942, alleged to be the last will and testament of the decedent. Upon the sole ground that his mother was of unsound mind at the time she executed her will and therefore incompetent to make the same, one of the sons, Bernerd Schwartz, contested the admission of the proffered will to probate.

By the terms of the will in question, all of the property of the decedent, both real and personal, appraised at $12,500, was given in fee to the granddaughter, Lois Schwartz, there being reserved to the sons one-third each of the net income of said estate during the life of her said sons. Upon the death of either son, his share of the net income was to go to his wife until she remarried or died. The remaining one-third of the net income was given to the granddaughter. In the will decedent named both her sons, Harold and Bernerd, as coexecutors.

Following a trial, the court made findings and ordered the will admitted to probate, appointing Harold I. Schwartz as sole executor of said will.

Upon the grounds of insufficiency of the evidence to sustain the order admitting the will to probate and upon newly discovered evidence, the contestant made a motion for a new trial, which was denied. This appeal is from the order admitting the will to probate and appointing Harold I. Schwartz as sole executor as well as from the order denying a new trial.

In support of his contention that his mother was of unsound mind and memory at the time she executed her will, the contestant presented evidence that on January 1, 1942, decedent was admitted to Cedar Lodge Sanitarium at Los Angeles and discharged therefrom on May 9, 1942. With reference to the

reason for the discharge of the decedent from Cedar Lodge Sanitarium, the owner thereof testified "We sent for the family to come and take her home because she was causing such a disturbance and she was so uncooperative; we had to call the family and ask them to please come and take her home." Decedent was removed from the above named sanitarium to the home of her son, Harold, where she remained for some six weeks, and at which place she executed the will here in controversy. On June 20, 1942, decedent entered Virginia Sanitarium in Los Angeles, where she remained until the date of her death on December 8th of the same year.

With reference to his mother's condition on June 6, 1942, four days after the execution of the will, her son, Bernerd Schwartz, testified: "She was in very bad shape. She had a nurse day and night; in fact, I went out and secured a special bed for the nurse to sleep on. I thought it was too hard for my brother to keep her there, and I wanted to find another sanitarium. The reason she was taken from the Cedar Lodge Sanitarium, I understand, was because she was in such bad physical condition that she called up her physician. . ."; that "Her memory was very bad. It took her about four days at the Virginia Sanitarium to learn she had been moved."

There was also testimony that while at Cedar Lodge Sanitarium the decedent ". . . did have spells when you could not control her very well" and the family would have to be called "to come out and control her"; that she would "run around the halls in her night-gown"; would also say that "she did not have her meals and that the nurse hadn't been near her all day," when in fact she had received both meals and nursing attention; and that she refused medication because of her apprehension that someone was attempting to poison her.

The owner of Virginia Sanitarium testified as follows regarding the condition of the deceased while at that sanitarium: That while there the decedent "was at times all right, and at other times she would have more or less lapses of memory. That seemed to be her big fault; she would not remember; she would keep repeating and wanting to know dates; she used to keep a diary because she could not remember"; that, on occasions when her sons would visit her, the decedent would say "No one was here to see me today"; that "many times; she would hear someone talking and would think the Army

was taking over the place,'' even though she was told time and again such was not the fact. That it was necessary to keep a rail about the bed in order to keep the decedent in it.

Coming now to a consideration of the circumstances immediately surrounding the preparation and execution of the will, it is revealed by the record that on June 1, 1942, the decedent informed Mrs. Phyllis Schwartz, wife of the proponent of the will, that ''she wanted to write a will,'' and that ''she would not be happy without writing a will.'' Decedent thereupon requested Mrs. Phyllis Schwartz to ''bring me a paper and pencil,'' with which request Mrs. Schwartz complied and, according to the latter's testimony, the decedent ''was in the process of writing the will practically all the day before I delivered it to Paul Joseph's office.'' This witness further testified that on this same day she telephoned to the contestant advising him that his mother was ''making a will all that day,'' and that the witness ''felt that Bernie should come out to my house and know what was going on.'' That on the same evening about 9:30 o'clock, the contestant arrived at his brother's home, and went to his mother's room, where the latter said to him, ''Bernie, I am writing a will. I would like to discuss it with you,'' to which the contestant replied ''Maw, I am not interested.'' The foregoing testimony was given in rebuttal and the contestant did not take the witness stand to deny it. However, he did testify that when he visited his mother on June 6th, which was four days after the execution of the will, ''she was in very bad shape,'' and he gave his reasons for so testifying.

From the record it appears that on June 2, 1942, which was the day after the decedent had completed the aforesaid writing, the witness Phyllis Schwartz, at the request of decedent, delivered the written document to Attorney Paul Joseph in his office, stating that the decedent had ''instructed me to get it copied.'' Shortly thereafter, Attorney Joseph handed Phyllis Schwartz a sealed white envelope which the witness returned to the decedent. That evening Attorney Joseph and his wife called upon decedent and the will here in question was executed, with the attorney and his wife acting as subscribing witnesses thereto. It also appears that the attorney had previously prepared at least one and possibly two wills for the decedent.

Concerning the actual execution of the will, Attorney Joseph testified that he had practiced law since 1928; that he was

acquainted with decedent for some twenty or twenty-five years and had acted as decedent's attorney ''at different intervals, different times.'' The attorney testified that for some three-quarters of an hour prior to the execution of the will he talked alone with the decedent, after which he invited his wife into the room and in her presence and in the presence of the decedent the attorney stated that ''Mrs. Schwartz had read over the will,'' to which the decedent replied ''Yes, she had read it over.'' The lawyer then asked decedent ''if she was ready to sign it,'' and ''she indicated she was ready to sign it.'' Decedent then requested Attorney Joseph and his wife to act as witnesses to the will. The attorney testified that he then ''asked her if this will was as she wanted it'' and she said ''Yes, it was, and it was a good will''; and I said, ''You know it is. You have gone over it for a half an hour.'' ''And then before we signed the will, Mrs. Schwartz and my wife talked over various things—— just what they were I don't recall now, and then she signed the will.'' In answer to a question as to whether decedent read the will before she signed it, Attorney Joseph testified: ''Yes, she had read it for a period of a half hour before Mrs. Joseph came into the room. She was there with me and she was reading this will, and some pencil notes from which this will was drawn for her, and she was comparing the will and the notes; and she eventually signed; with the pencil notations, we went over the will paragraph by paragraph, and discussed the provisions of the particular paragraphs. That took place before Mrs. Joseph came into the room.''

When interrogated as to whether at the time she signed her will the decedent appeared to be of sound mind, the lawyer testified: She told us she certainly did not want her property sold, and that one of her sons might sell her property, and that was the last thing she wanted because she eventually wanted her granddaughter, Lois, to get the property; and that she would not get the property if they sold the property and disposed of the proceeds, and I said, 'It is not as bad as you make out', that nobody was going to do that, in my opinion; but she said I did not know her sons so well, and she did.''

Mrs. Jane B. Joseph, the other subscribing witness, corroborated the testimony given by her husband that at the request of decedent they acted as subscribing witnesses to the will, that decedent signed the testamentary document in their pres-

ence and that they, in the presence of each other and of the decedent, affixed their respective signatures as such subscribing witnesses. Mrs. Joseph also testified that she had known the decedent for some six or seven years; that at the time decedent signed the will she was of sound mind, conscious, and required no assistance in signing her name. That her conversation was clear and coherent and, "In fact, she even asked me about my mother's sisters who were visiting here, and at different times she had met them."

In his effort to establish the fact that his mother was of unsound mind at the time she executed the document here in question, contestant places great reliance upon a diary kept by decedent during the year in which she died, and which was introduced into evidence and is by stipulation now before us. Our attention is especially directed to: (1) the grammatical construction of the sentences; (2) the spelling; and (3) the chronological order of the entries. Contestant urges that by comparison of the spelling and the grammatical construction contained in the diary with those of the pencilled form of will prepared by decedent, the conclusion is inescapable that decedent could not have drafted the pencilled will unaided, or even by copying it from another will. It is not disputed that the memorandum form of will, from which the formal testamentary document was framed, is in the handwriting of the decedent, and from a comparison of it with the writing of the testatrix contained in the aforesaid diary we are not impressed with contestant's claim that the decedent did not herself and unaided prepare the pencilled form of will. There is no such disparity in the writing contained in the respective documents to reasonably warrant the inference that decedent was aided in the actual writing of the pencilled memorandum. Our conclusion in this regard is strengthened by comparison of the pencilled memorandum with the writing contained in the memorandum made by decedent on May 24, 1942, which was received in evidence as proponent's Exhibit 7.

While it would reasonably appear, as contended by contestant, that the use of legal language and technical terms in the pencilled memorandum might indicate the receipt of some help by decedent in its construction, it must be borne in mind that the testatrix had made one or more previous wills and was to some extent familiar with the phraseology in which testamentary documents are couched. And, in the absence of some facts or circumstances to the contrary, we cannot ignore the

positive testimony in the record as to the manner in which the pencilled memorandum was prepared.

Whatever may be said as to the claimed indecision of decedent and her lapses of memory as indicated by a perusal of her diary, it cannot be doubted from a reading of the pencilled memorandum that the trial judge was justified in concluding that the decedent was aware of the nature and extent of her property and as well of those who had a claim upon her bounty. She minutely describes therein her personal property and wearing apparel, sets forth where some of the articles were stored, giving the street address of such storeroom. In clear and understandable language, she describes her real property and the street address of same, clearly sets forth her wishes in regard to its disposition as well as the manner in which the income therefrom was to be divided. Though it be conceded that decedent was somewhat uncertain as to dates and events, or even confused, there is no evidence that she was afflicted with a mental derangement sufficient to invalidate the will here in question. In other words, the evidence does not establish that decedent was the victim of some hallucination or delusion or that she suffered from insanity of such broad character as to establish incompetency generally. Nor does the evidence establish the fact that the will as made was the creature or product of any such hallucination or delusion which bore directly upon and influenced the terms of the testamentary document. ■ In short, before a solemnly executed will may be set aside, the claimed abnormalities of mind must have had a direct bearing upon the testamentary act, and the evidence must establish the fact that the decedent devised or bequeathed her property in a manner which, except for the claimed mental infirmities, she would not have done. There is no such showing here. (*Estate of Chevallier,* 159 Cal. 161 [113 P. 130]; *Estate of Collins,* 174 Cal. 663 [164 P. 1110]; *Estate of Redfield,* 116 Cal. 637 [48 P. 794]; *Estate of Casarotti,* 184 Cal. 73 [192 P. 1085].) In *Estate of Kendrick,* 130 Cal. 360, at page 364 [62 P. 605], it was said:

''Prejudices, dislikes and antipathies, however ill-founded, or however strongly entertained, cannot be classed as insane delusions, nor is every delusion an insane delusion.''

■ Dislike of one's relatives, with or without reason, is not necessarily proof of insanity.

■ Until the contrary is established, testamentary capacity is always presumed to exist. Upon the contestant rests

the burden to show affirmatively and by a preponderance of the evidence that the testator, *at the time of executing the will,* was of unsound mind and that such unsoundness of mind actually affected or controlled testamentary capacity. The question is not what *may* have been the testator's mental state at the time of the testamentary act, but *what it actually was.* ■ The testimony of the subscribing witnesses to the will, Paul B. Joseph, who had known the decedent for nearly a quarter of a century and who had for some years been her attorney, and his wife who was also well acquainted with decedent, was direct, clear and unequivocal to the effect that the testatrix was of sound mind. It is presumed in law that a subscribing witness had his attention directed to, and was cognizant of, the testator's mental capacity. Consequently, the opinion of such a witness is entitled to considerable weight and certainly to more weight than is the opinion of one who is merely passive (*Estate of Holloway,* 195 Cal. 711, 733 [235 P. 1012]). ■ True, evidence of the condition of the testatrix' mind, before and even after the date of her testamentary act, is admissible, but it assumes importance only insofar as it bears upon that condition at the very time of the execution of the will. ■ Testamentary capacity exists when the testator understands the nature and situation of his property; recalls and understands his relation to the persons who have claims upon his bounty and whose interests are affected by the provisions of the will. ■ That decedent herein possessed such understanding is fortified by the writing of the pencilled document prepared by her on the day before she executed her will and upon which the formal testamentary document was based and framed. Application by the trial court of the principles of law herein enunciated to the evidence adduced in the case at bar warranted the conclusion arrived at that the contestant failed to sustain the burden of establishing the fact that, at the time of the execution of her will, the testatrix was so mentally incapacitated that she did not possess the requisite testamentary capacity. What others than the testator may think as to the justice or injustice of a will is simply a matter of opinion and therefore, before the law will permit judges or juries to make disposition of a decedent's property irrespective of his or her desires, substantial evidence is required to show lack of testamentary capacity at the time of the execution of the will. Such evidence is not present in the instant proceeding.

It is next contended that the court erred in appointing Harold I. Schwartz as sole executor when, according to the provisions of the will offered for probate, said Harold I. Schwartz and Bernerd Schwartz were named as coexecutors. Contestant urges that nowhere in the record does it appear that he waived his right to act as coexecutor or that he refused to act in such capacity.

Section 324 of the Probate Code provides:

"If the person named in a will as executor, for thirty days after he has knowledge of the death of the testator and that he is named as executor, fails to petition the proper court for the probate of the will and that letters testamentary be issued to him, he may be held to have renounced his right to letters, and the court may appoint any other competent person administrator, unless good cause for delay is shown."

That the contestant had knowledge of the fact that he was named as one of the executors of decedent's will clearly appears from the petition for probate of such will filed by the proponent thereof, and to which petition the contestant filed his contest. In the petition for probate of the will appears the following:

"That Bernerd S. Schwartz named as co-executor in said will has indicated that he would not be a proponent thereof and has evinced the intention to contest said will, so for that reason this petitioner is offering said will for probate."

That contestant failed, for a period of more than thirty days, and in fact for many months, to petition the court for his appointment as coexecutor admits of no doubt. On the contrary, he instituted legal proceedings to invalidate the will on the ground that the maker thereof was of unsound mind and without testamentary capacity at the time she executed the testamentary document. Contestant's entire course of conduct has been inconsistent with any desire upon his part to act as a coexecutor, and at no time did he petition or request the court to so appoint him. It seems clear to us that one of the foremost duties of an executor named in a will is to offer the same for probate and to carry out its provisions. We are persuaded that contestant's failure to petition the court for probate of the will and for the issuance of letters testamentary to him as a coexecutor, coupled with his action in commencing legal proceedings in opposition to probate of the will, may be held as a renunciation of his right to letters

(Prob. Code, § 324), and supports the finding made by the court "That Bernerd Schwartz, also named in said last will as an executor, refused to act as such by filing herein specifications of objections to the probate of said last will and testament."

■ Finally, contestant urges that the court committed prejudicial error in sustaining objections to certain proffered evidence. In that regard, the record reveals that, during the direct examination of contestant, Bernerd S. Schwartz, the following occurred:

"Q. What was the condition of your mother previous to her death, two years previous to her death?

"Mr. Miller: That is objected to as incompetent, irrelevant and immaterial, and too remote.

"The Court: Yes; we are only concerned with the date of the will."

It is now urged that the ruling of the court "precluded the possibility of contestant's showing that the testatrix was suffering from senile dementia and gave the proponent the opportunity of contending that the will in controversy was executed during a lucid moment." But at no time during the trial was the court apprised of the fact that contestant was urging that his mother was suffering from senile dementia. If the contestant desired to offer proof of his mother's unsoundness of mind emanating from a permanent and progressive mental disease such as senile dementia, which will be presumed to continue in the absence of evidence to the contrary, he should have so advised the court, but the record is barren of any evidence, showing, or statement that such was contestant's contention. The objection was therefore properly sustained on the ground that the time element involved in the question was too remote to prove unsoundness of mind or to show the actual mental condition of the testatrix *at the time of the execution of the will.* Where as here, the court was not advised of the particular issue, viz., senile dementia, upon which evidence of the particular type or character was offered, and had not intimated that no evidence would be received upon such issue, it became necessary for contestant to make an offer of proof (*Lawless* v. *Calaway,* 24 Cal.2d 81, 91, 92 [147 P.2d 604]). The purpose of such evidence and an offer of proof in that regard cannot be urged for the first time on appeal.

■ Appellant also complains of the action of the court in sustaining an objection to the following questions propounded to a witness and the answers given thereto.

"Q. Did she ever discuss her property affairs with you? A. Certainly she did. I know just how she was situated.

"Q. And you know to whom she wanted to leave her property? A. Yes."

An objection on the ground that the testimony was "incompetent, irrelevant and immaterial and not within the issues of this case" was sustained by the court.

Counsel for contestant then stated to the court that the purpose of the testimony was to prove unsoundness of mind by showing that the testatrix had bequeathed her property "in a way different from the way they would have left it, as they had indicated, when they were of sound mind, it shows that at the time they left their property in a way different, they were of unsound mind." The court thereupon stated: "To which she has already testified. I will sustain the objection. She has already given her opinion."

During further examination of this same witness, the record discloses the following:

"Q. The conversation you had with Mrs. Schwartz regarding her property, what was said in regard to who she was going to leave her property to? A. Just to her two children. That was her whole thought; that was all she thought of, her two children. That is what she wanted. But that is not what I wanted to tell you: When I went to see her, she would say to me—— I would say to her, 'Was your son here today?' And she would say, 'Oh, Sarah, I wish I could tell you, but I cannot remember'. Could a woman like that make a will?

"The Court: I will strike that all out."

The rulings of the court were obviously correct. The answer to the first aforesaid interrogatory was manifestly a conclusion of the witness while the answer to the second question was for the most part open to the same criticism. ■ Furthermore, as the court correctly stated, the witness had previously given her opinion that while decedent was in the two sanitariums "she was in terrible condition." Therefore, in view of the stated purpose and object of the questions, had the rulings been erroneous, any harmful effect which might have been produced thereby was obviated by the testimony of the witness, previously given, as to the condition of the testatrix at the time referred to in the questions (*McNulty* v. *Lawley*,

42 Cal.App. 747, 751, 752 [184 P. 50]; *John Breuner Co.* v. *King*, 9 Cal.App. 271, 273 [98 P. 1077]).

Since an order denying a motion for a new trial in a civil case is not appealable (*Pipoly* v. *Benson*, 20 Cal.2d 366, 368 [125 P.2d 482, 147 A.L.R. 515]) the purported appeal herein from the order denying a new trial is dismissed. The evidence is sufficient to support the decision. The record discloses no error, and the order appealed from should be affirmed.

It is so ordered.

York, P. J., and Doran, J., concurred.