[Civ. No. 15783.   Second Dist., Div. One.   July 2, 1947.]

Estate of LILLIE A. RUSSELL, Deceased.   LILLA
STROUGHTON et al., Respondents, v. EVELYN A.
McGOWAN et al., Appellants.

712

L. M. Phillips, Ernest Best, and P. E. Cavaney for Appellants.

Pearce, Campbell, Brayan & Norcop and Henry P. Goodwin for Respondents.

WHITE, J.—This is an appeal by the proponents of the will of Lillie A. Russell from a judgment annulling the probate of said will and revoking letters testamentary issued thereon, which judgment was entered pursuant to the verdict of a jury declaring "that the will of October 16, 1944 is not the will of Lillie A. Russell."

Contestants attacked the will on the grounds of undue influence, fraud and incompetency. However, after all of the evidence adduced by the parties had been received, contestants abandoned the first two grounds of contest, and the matter was submitted to the jury on the sole issue of the claimed incompetency of the testatrix.

Motions appropriately made for a nonsuit and directed verdict were denied. A motion for judgment notwithstanding the verdict was interposed, but so far as the record discloses was never ruled upon. A motion for a new trial was denied.

Lillie A. Russell, the testatrix, died at Glendale, in Los Angeles County, on October 23, 1944, and at the time of her demise was 82 years of age. She came to California about the year 1895 with her husband, who predeceased her by some four years. For a number of years they were engaged in the wholesale millinery business in Los Angeles, the testatrix looking after the financial end of the business and her husband giving his attention to the manufacturing end. The value of the estate here involved is approximately $63,779 and the beneficiaries under the will include a nephew, grandnephews, nieces and grandnieces, while the contestants, three in number, are alleged to be the niece, grandniece and nephew of the testatrix.

The circumstances leading up to the execution of the will as reflected by the record are that on October 10, 1944, decedent telephoned an officer of the Glendale Branch of the Security-First National Bank requesting him to call at her home, which he did. At this meeting the decedent inquired as to whether the bank would be willing to act as executor of her will. After answering the inquiry in the affirmative, the bank official engaged in some conversation with decedent concerning her relatives and heirs, and advised her to consult an attorney. Decedent then requested the bank officer to ask attorney Clency H. Hasbrouck to call upon her. The officer of the bank had known the decedent some four years, during which interim he had talked with her some three or four times in regard to her affairs. As a result of the telephone call from the bank official, Attorney Hasbrouck visited

decedent on October 11, 1944. She met the attorney at the door of her home and escorted him into the living room where she discussed in detail her proposed will. Attorney Hasbrouck made notes to be used by him in the preparation of the will. This was on Wednesday, October 11. The following Sunday, October 15, the decedent was not well and remained in bed. On that date she told Ernest L. Wellman, a nephew of her deceased husband, about her contemplated will, handed him the card of Attorney Hasbrouck and requested that on the following morning he contact said attorney and "have him come right up." Pursuant to Mr. Wellman's message, Attorney Hasbrouck took the will he had prepared to the home of the decedent on October 16, where it was executed about 10 or 10:30 a. m. in the presence of himself and his secretary, Miss Helen Burland, both of whom signed as subscribing witnesses.

Attorney Hasbrouck testified that prior to the execution of the will he read it to the testatrix paragraph by paragraph, and specifically asked her about each bequest or devise. That testatrix expressed her approval by either nodding her head or saying, "Yes," or "That's all right." That during the reading of the document the testatrix interrupted once to ask what further provisions could be made for her niece Mrs. Sarah E. Whipple in the event the latter should be required to take care of the testatrix over a prolonged period of illness. When informed by the attorney that should such an event occur Mrs. Whipple might file a claim against the estate for her services, the decedent announced her readiness to execute the will.

Attorney Hasbrouck also testified that while signing the will the testatrix was propped up in bed and the document was placed before her on a magazine and file cover. When first signing her name her hand slipped and the signature had an extra "L" in it. When the attorney commented upon this, the testatrix again affixed her signature. In his testimony concerning what occurred at the time the will was executed, Attorney Hasbrouck was corroborated by his secretary, Miss Burland. The attorney testified that while the testatrix was in bed and ill when she executed her will he was "sure she understood what she was talking about."

The admission to probate of the will of October 16, 1944, here in question, "established *prima facie* for all the purposes of the contest, that it was duly executed in the manner required by law by a testator who was competent,

free from undue influence, etc. The burden of proof was on the contestants to establish its invalidity.'' (*Estate of Baird,* 176 Cal. 381, 384 [168 P. 561].) ▮ It is only when the contestant has established a *prima facie* case of the absence of testamentary capacity that the proponent of the will has the burden of meeting it. ▮ Testamentary capacity is always presumed to exist until the contrary is established, and the ultimate question is what was *actually* the testator's mental state at the time of the testamentary act, and not what it *may* have been.

As a first ground for reversal appellants earnestly urge that there was not substantial evidence to justify the verdict of the jury or to support the judgment based thereon. ▮ When a verdict rendered in a will contest is attacked as being unsupported by the evidence, the province of a reviewing court is the same as in any other civil case. In such a situation the power of an appellate tribunal begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury. And when two or more inferences can reasonably be deduced from the facts, a reviewing court is not authorized to substitute its deductions for those of the triers of fact.

We shall not attempt to analyze the evidence of witnesses who testified in behalf of the appellants. It was the province of the jury to weigh and consider that evidence. Our duty begins and ends with a determination of whether there is adequate evidence to support the findings of the jury and the judgment of the trial court. Should we conclude there is sufficient evidence to serve that purpose, it would be an idle task to review the aforesaid conflicting testimony and this we say because, while we are authorized to consider the evidence, we are not authorized to weigh it. That was the function of the jury. And they were warranted in believing as true all the evidence in support of contestants' claims and in discrediting as untrue all the evidence in behalf of the proponents which was in any way contradictory or otherwise impeached. ▮ It is well established in our law that under our Constitution, appellate courts are not authorized to review evidence, except where, on its face, it may justly be held that it is insufficient to support the ultimate issue involved, in which case it is not a review of a question of fact but purely one of law.

Guided by the foregoing rules, we now turn to a consideration of the evidence offered in support of the verdict. Ernest L. Wellman testified he was related to the decedent only by marriage and was not a beneficiary under any will drawn by her. He had known the testatrix for over 40 years and was a nephew of her deceased husband. During the last six months of decedent's life this witness had seen her at least twice a week, and talked with her frequently. He testified that during the last six months of her life she failed mentally and physically; that she experienced great difficulty in moving about and would ask the witness from time to time to obtain articles for her when they were right in front of her. He testified that he saw the testatrix one day prior to the making of her will and found her very weak, that she talked in a whisper and was lying with her eyes closed and ''in a semi-coma.'' In answer to a question by the court as to whether he had formed an opinion as to testatrix' mental condition on the morning of October 16, when the will was executed, witness stated, ''in my opinion she was insane.'' In support of this opinion, he testified, ''he went into her room shortly before the will was signed. He told her that Mr. Hasbrouck was coming up there and she made no reply, did not seem to understand what I had said. . . .'' Again, with reference to the same occasion, he testified, ''Well she was lying there on the bed with seemingly no consciousness, and she was partly paralyzed, some of her functions were paralyzed, did not seem to act as if she did not really know me. I think that is all I care to say.''

John H. Judd, an investment broker, testified he had business relations with the decedent from about 1940 until about September of 1944, approximately a month prior to her death. During this period of some four years he had visited with her on an average of about once a month, had discussed many business matters with her including income tax returns, stock investments, drawing of a will, family matters, and problems of her family. He testified that he observed that on the occasion of his visit with the testatrix in September of 1944, she was not as well as she had been previously; that she had a bad color and did not talk as coherently as she had prior thereto. In comparing his visits through the years with his visit of August, 1944, the witness testified that testatrix did not act in any manner the same as she had on prior occasions and on the visit of August, 1944, the decedent discussed with him how her marketing was to be done, family

problems, who had been to see her during the past six months, and that her statements were repeated over and over again. This witness also testified that when he last visited her on September 9, 1944, he formed an opinion as to her mental capacity, stating that "she was mentally not sane." This opinion he based on the fact that no matter what he told her to do in the matter of financial transactions he believed she would have done it whether it was for her own good or not. And that contrary to his previous experiences with her, she was unable to recognize his argument or follow his reasoning and that her mind would definitely wander.

Mrs. Gladys Evelyn Woodard, a trained nurse with 15 years of experience, including a period of years when she was nurse in an asylum for demented people at Columbus, Michigan, testified that she became the decedent's nurse about 8:30 o'clock on the morning of October 17, 1944, the day following the execution of the will. She testified that on arriving at the home of the decedent she found her in a stupor, "in a very deplorable condition," that she had attempted to arouse the patient but was unsuccessful, that she had tapped her on the side of her cheek to which there was no response or even a reflex of the eyelids. That "then I went about to clean the patient up and to change her linens, before I even gave any of the medicine or anything, because she was in such a bad condition, in a bad way." The nurse further testified that the decedent was unable to swallow and that it was necessary to take her temperature under the armpit. In answer to the question propounded by the court, "What did you observe as to her general condition on that morning?" (referring to October 17, 1944), the witness stated that the decedent was in a weakened condition physically and "mentally she was in a stupor." This witness testified that during the entire time she was in attendance upon the decedent, which was for a period of approximately one week, and up to the time of the death of the testatrix, she heard the latter speak but once and at that time in order to hear her she was compelled to bend over her. On October 19, after the nurse had been there some two days, the testatrix spoke to her, saying, "Who are you; what are you doing here?" The witness further testified this was the only time decedent rallied at all. That on Tuesday, October 17, she did not speak, and on Wednesday the 18th, was in a stupor all day. The witness testified that during the entire

time she was there she observed decedent every day and knew her physical as well as mental reactions. That when she arrived on the morning of October 17, she found the decedent in a stupor, "her physical condition was poorly. Her mental condition, she was in a stupor, I could not arouse her. . . ." The nurse further testified that during the week she was in attendance, decedent was not in a position to visit with anybody. In connection with the signing of a bank signature card by the testatrix with an "X" the nurse testified, "they tried to explain to her, but it did not penetrate; she did not even open her eyes."

Mrs. Grace Woods, who was a neighbor of the decedent for 14 years, living next door, testified that she saw her once or twice a week, that on October 16, 1944, about 8 o'clock in the morning, approximately two hours prior to the execution of the will, the witness visited in the sick room of the decedent, tried to talk with her but could not get any answer; that her eyes were closed and that she did not respond to questions asked.

Mrs. Helen McBride, who lived across the street from the decedent for about seven years and who for a period of some four years took the testatrix to market about twice a week, testified that on her return from Arrowhead on the evening of October 15, 1944, the night before the execution of the will, she was called to the decedent's house because of the latter's illness; that she assisted in calling a physician and remained with the decedent all of the time that the doctor was there; that she was there every night thereafter up to the time of the death of the testatrix; that during the last week of her life the testatrix was more or less in a coma and could talk only in a whisper. That her eyes were closed most of the time. When this witness was asked, "was she (testatrix) of sound mind on October 15, 1944, in your opinion?", she answered, "Well, I would sort of hesitate to say. Yes." When asked, "Was she of sound mind on October 16, in your opinion, that is Monday night?" (the day upon which the will was executed) the witness answered, "No, I would say definitely not Monday night." In giving her reasons for her expressed opinion the witness testified that the decedent "did not talk; her mouth was as thogh her tongue was thick, she could not articulate properly, as though she had an affliction of her speech, in other words, and her mind seemed to be as slow as her speech was; she did not

respond whatsoever, did not open her eyes, she did not seem to recognize I was there. When I talked to her I would not get any answer.''

Another witness called by the contestants was Elsie M. Wilson, the wife of the nephew of the decedent who, together with her husband, visited the home of the testatrix on the 22d of October, the day before Mrs. Russell's death. With reference to the latter's condition on that day, this witness testified, ''they said that she had been in a coma practically the whole week.''

Mr. George E. Wilson, husband of the last-named witness, testified with reference to the decedent's condition on October 22, by saying, ''Well at first glance I would not have recognized her. She did not have her glasses on, she neither had any set of teeth in. The last few years she has always had her glasses on except when her eyes ran and she wiped them. She was in no condition at all to say anything whatsoever; she was practically dead.''

As heretofore indicated, there was testimony, including that of the attending physician of the testatrix, which was in direct conflict with the foregoing, but for the reasons hereinbefore stated we shall not narrate nor analyze the same.

■ An unbroken line of decisions in this state hold that testamentary capacity exists if at the time of the execution of the will the testator is possessed of sufficient mental capacity to be able to understand the nature of the act he is performing, and to understand and recall the nature and situation of his property, and to remember and understand his relations to the persons who have claims upon his bounty, and whose interests are affected by the provisions of the instrument.

■ While in the instant case, the testatrix was in feeble health, suffering from disease, aged and infirm, these facts are not sufficient of themselves to establish testamentary incapacity unless it be shown by a preponderance of the evidence that her condition of mind and body *at the time of the execution of the will* was such that she was unable to understand the nature and situation of her property and the disposing of it intelligently. In other words, it must be shown that her weakened and enfeebled condition had a direct influence upon the testamentary act. Section 20 of the Probate Code empowers every person of sound mind, over the age of 18 years, to dispose of his separate property by will.

And the property being his to dispose of as he wills, he is not called upon to consult or satisfy the wishes or views of juries or courts. ■ The presumption is always that a person was of "sound mind" at the time of execution of his will, and the burden therefore always rests upon the contestants to show affirmatively and by a preponderance of the evidence, the incapacity of the testator and the further fact that, because of the mental or bodily infirmities with which the testator was afflicted, he devised or bequeathed his property in a way which, except for the existence of the aforesaid infirmities, he would not have done.

In the case at bar it appears without contradiction that on October 11, 1944, the testatrix requested a bank official to have Attorney Hasbrouck call upon her. It is also uncontradicted in the record that when he called on the testatrix she admitted him to her home and concededly was in full possession of her faculties, for at that time she gave the attorney minute, full and comprehensive instructions regarding the terms of the will which she desired him to prepare for her. The attorney made notes of these instructions, and the will here under attack was prepared in accordance with such directions of the testatrix.

It should also be remembered that without contradiction it was established at the trial that on October 15, after decedent had taken to her bed, she advised the witness Wellman that she "had made a new will," gave him Attorney Hasbrouck's professional card and asked him to see the attorney on the following morning and "have him come right out." There cannot be any question but what the testatrix then knew and understood what instructions she had previously given the attorney and what she proposed to do with her property. Neither can there be any doubt that the will executed on the following day, October 16, was prepared in accordance with her previously given instructions. It is not contended, nor was it shown at the trial, that the testatrix was afflicted with insanity or that she suffered from any delusions or hallucinations. Her claimed incompetency is predicated solely upon alleged physical infirmities occasioned by bodily illness. All of the testimony produced in behalf of the contestants, and hereinbefore narrated, concerned the condition of the testatrix before and after the execution of the will, and was admissible only as it tended to show that condition at the very time the will was made. True, some of the

testimony was as to the condition of the testatrix some two hours before or after the execution of the testamentary document, but as to the condition of the testatrix at the time of the execution of her will we have only the testimony of attorney Hasbrouck and his secretary. The testimony of the lawyer, whose professional duty it was to ascertain the condition of his client's mind, was that she was competent, and, "knew what she was talking about." There is also other direct and positive testimony that on the morning of October 16, between 10 and 12 o'clock, within which interim the will was signed, that the testatrix was mentally competent and of "sound mind."

Before a solemnly executed will may be set aside, the claimed infirmities of mind or body must be shown to have had a direct bearing upon the testamentary act, and the evidence must establish the fact that the deceased devised or bequeathed her property in a manner which, except for the claimed infirmities, she would not have done. (*Estate of Schwartz,* 67 Cal.App.2d 512, 519 [155 P.2d 76], and cases therein cited.)

There is no such showing by substantial evidence in the instant case.

The evidence in the case with which we are here concerned is very much weaker than that held insufficient to justify the setting aside of the wills in other cases decided by the appellate courts of this state. It is unnecessary to do more than to cite the following authorities in support of this statement: *Estate of Perkins,* 195 Cal. 699 [235 P. 45]; *Estate of Clark,* 170 Cal. 418 [149 P. 828]; *Estate of Chevallier,* 159 Cal. 161 [113 P. 130]; *Estate of Purcell,* 164 Cal. 300, 305 [128 P. 932]; *Estate of Casarotti,* 184 Cal. 73 [192 P. 1085]; *Estate of Finkler,* 3 Cal.2d 584 [46 P.2d 149]; *Estate of Garvey,* 38 Cal.App.2d 449 [101 P.2d 551]; *Estate of Schwartz,* 67 Cal.App.2d 512 [155 P.2d 76]; *Estate of Kendrick,* 130 Cal. 360, 363 [62 P. 605].)

The burden rested upon the contestants throughout the case. Taking all the foregoing evidence adduced by them as true, it falls far short of the requirements of the law as constituting satisfactory rebuttal of the inference of testamentary capacity at the time of the execution of the will, the existence of which is destroyed only when it is shown by substantial evidence that a testator was unable to understand and carry in mind the nature and situation of his property,

and his relations to his relatives and those around him, incapable of understanding the act he is doing and the relation in which he stands to the objects of his bounty if any.

The foregoing conclusion at which we have arrived renders it unnecessary to discuss or decide other issues presented on this appeal.

Their day in court was had by all the parties to this proceeding and the litigation should be terminated without unnecessary delay and further expense. The motion of the proponents and appellants for a judgment notwithstanding the verdict should have been ruled upon and granted.

It appearing to us from a consideration of the entire record that the same fails to disclose any *substantial* evidence that at the time of the execution of the will the testatrix was of unsound mind, and that therefore a verdict should have been directed in favor of proponents and appellants, and that a motion therefor was made before the entry of judgment, the judgment rendered is reversed with directions to the court below to enter judgment in favor of proponents as prayed.

York, P. J., and Doran, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied August 28, 1947. Carter, J., voted for a hearing.