[Civ. No. 6536. Fourth Dist. May 11, 1961.]

JAMES MEIRELLES, Respondent, v. ROBERT GOOD et al., Defendants; ED CURTIS, Appellant.

[Civ. No. 6537. Fourth Dist. May 11, 1961.]

LLOYD C. PENDERGRAFT, Respondent, v. ROBERT GOOD et al., Defendants; ED CURTIS, Appellant.

[Civ. No. 6538. Fourth Dist. May 11, 1961.]

ROBERT BARTLETT, Respondent, v. ROBERT GOOD et al., Defendants; ED CURTIS, Appellant.

Barreiro & Dilling and Lawrence W. Clawson for Appellant.

Walch, Griswold, Braden & Dittmar and Herbert M. Braden for Respondents.

GRIFFIN, P. J.—These actions were consolidated for trial and on appeal. In action 14253, 4 Civil No. 6536, plaintiff and respondent James Meirelles, doing business as Hanford Planing Mill, sought a judgment against defendant Robert Good and defendant and appellant Ed Curtis for $11,769.92, plus interest. In action 14270, 4 Civil No. 6538, plaintiff and respondent Robert Bartlett sought judgment against defendant Robert Good and defendant and appellant Ed Curtis for $822.83, plus interest. In action 14254, 4 Civil No. 6537, plaintiff and respondent Lloyd C. Pendergraft, an individual doing business as Lloyd Plumbing Supply Company, sought judgment against defendant Robert Good and defendant and appellant Ed Curtis for $2,481.38, plus interest. All three actions were for goods, merchandise and labor furnished Robert Good and Ed Curtis, doing business as Robert Good Enterprises, a copartnership. Defendant Good defaulted and filed a petition in bankruptcy. Appellant Curtis, by answer, denied generally the allegations of the complaints.

The principal issue in the case was whether or not the defendants were copartners during the time that the indebtedness referred to in each complaint was incurred, and whether such indebtedness was a partnership debt. After the court found that a partnership in fact existed, then incidental questions were presented as to the duration of the partnership and the amount of the indebtedness to the respective plaintiffs.

## Facts

Although the evidence is conflicting, there is testimony that in May 1954, after some discussion, appellant Curtis and Robert Good formed a partnership by a verbal agreement for the construction and sale of houses on subdivided land known as Sunset Acres. Prior to that time Curtis had been a real estate salesman and Good was in partnership with one I. W. Watkins. Curtis had helped subdivide the land. Neither Curtis nor Good had a contractor's license at the time. Good, as an individual, later obtained one on July 19, 1954. Curtis was to be in charge of sales and to have the exclusive right to sell the houses. Under the partnership agreement, Good was to be in charge of construction and obtain the materials therefor. The first of the materials was obtained on June 20, 1954, and the last about May 1, 1957. Good was to obtain the subcontractors and devote his full time to the construction of the houses, and was to draw a salary. Curtis was to carry on his regular real estate business, but he also assisted in the partnership enterprise. The profits of the partnership were to be split after the costs of construction, cost of land, Good's salary and costs of advertising were paid. The partnership operation was supposed to begin as of July 1, 1954, although material was actually obtained as early as June 20, 1954, and estimates of the costs of the planing mill material for various sizes and plans of houses had been previously obtained. The project included the survey of the land and the formation of a mutual water company, of which Curtis was the president and moving party. Curtis had a well drilled on the land. Curtis obtained a workmen's compensation insurance policy, taken out in the name of Good, and Good ordered material from plaintiff Meirelles for foundation forms for construction of the houses before July 1, 1954. In connection with the partnership project, Curtis also obtained an option in Good's name on 60 lots in Sunset Acres to build upon. At Curtis' suggestion, the option was put in Good's name so that he could obtain construction loans. Good was

required to take out construction loans and was to pay for the labor and materials, and was required to give a trust deed to the construction lender. Curtis advanced $1,312.50 to a mortgage company on June 1, 1954, and a similar amount on June 7, 1954. After Curtis had negotiated with agencies of the State of California about putting in a water system in Sunset Acres, he sat in on business transactions of the partnership and tried to keep prices down. He made some direct payments on a house Good built in El Rancho Park and did other things indicating a partnership relation existed between himself and Good. Thereafter, Curtis had a bookkeeper examine the partnership records to see what their financial status was, or to see if they were making or losing money, and to make a report on the first 11 houses that were built by the partnership. This examination was paid for by a Curtis and Good check dated October 8, 1955, signed by Good and approved by Curtis. Curtis had Good prepare a financial statement of Robert B. Good Enterprises on September 21, 1956. Curtis had checks printed and set up a Curtis and Good bank account and afterwards signed a partnership agreement dated February 8, 1955, showing the name of the business as "Robert B. Good Enterprises." This agreement recites in part:

"THAT WHEREAS, the parties hereto have been heretofore engaged in business as partners under the fictitious firm name of ROBERT B. GOOD ENTERPRISES, and are desirous of reducing to writing the partnership agreement under which they have been operating, and of including certain additional terms and conditions in order to contribute to the permanency of said partnership."

Curtis had Good furnish aluminum and material for a chicken house built by Curtis in June of 1955 and had work done by one Robert Nelson, through Good, on a dairy barn where Curtis had an interest in cattle, at partnership expense. It was determined that financing for the construction of the houses should be obtained in the name of one of the partners, and since Good was to do the constructing, he took out the loans in his name. Curtis was to, and did, put up the moneys required to get the partnership business established. Curtis hired and fired the office help, although Good paid their salaries from partnership funds. Curtis made trips to San Francisco and Fresno to arrange for financing the partnership operations, but stated that he did not want his name on the

business as he claimed it would affect him with the other real estate men, and at various times he presented previously dated documents for Good to sign which Curtis said were to protect him (Curtis) from the other realtors. To enable Curtis to have something to show other realtors inquiring about his relationship with Good, and to carry out this plan to keep other real estate men from believing he was a partner with Good, they signed a document on July 1, 1954, reciting that they were not partners and that Good was assuming all liabilities of the Robert B. Good Enterprises.

In connection with the partnership operations and the sale of the houses, Curtis had Good and his wife sign deeds and escrow instructions in blank. Good went into bankruptcy in May 1958 and Curtis asked Good's attorney to give him the partnership agreement which he had signed, saying that he would tear it up and straighten things out.

Between June 20, 1954, and May 1957, 47 houses were constructed by the partnership, mostly in Sunset Acres, but six in Short Acres, one in the Leoni Tract and seven in El Rancho Park, all of which houses were sold by Curtis under his right to sell the same as a partner, and in connection with the sales, Curtis prepared, or caused to be prepared, every set of escrow instructions and received from the escrows payouts totaling $33,000. Although all of the house transactions were handled in the name of Good and his wife, as the owners of the land and the borrowers for financing the construction loans, and as the sellers of the land and houses, all other business of the partnership was done in the names of Good, Curtis, Curtis and Good, or Robert B. Good Enterprises, except for the operations in connection with the setting up of the water company, where Curtis' name was used on most of the documents. Between June 1954 and May 1957, Curtis and Good had an office in the State Market Building. Curtis bought chairs and furniture which were paid for with partnership funds and which were later taken by Curtis at the time the partners went their separate ways in May 1957. A tractor was also bought by the partnership for leveling the land and digging ditches and a boat was purchased with partnership funds. When the partnership dissolved, these items were divided, Curtis taking the tractor and Good taking the boat, although all payments on these items were made by Good. During part of the time that Good and Curtis had an office together, Good paid office rent for Curtis' real estate business. When Good left the State Market Building office,

Curtis furnished a trailer for an office for the partnership operations in Sunset Acres. Curtis was present and participated in the conversations when Good was dickering with persons bidding on the construction work or materials, including plaintiffs Bartlett, Meirelles, and one Glen Cason, Pendergraft's assignor, who supplied labor and materials on these houses.

During the existence of the partnership, Good offered to transfer two building lots to Meirelles in partial payment of his claim, with the consent of Curtis, who later refused this offer.

Plaintiff Meirelles furnished to the partnership cabinet work, doors, trim, windows and other things of that nature, along with materials for the forms, between June 20, 1954, and May 2, 1957. Previously, Good had presented to plaintiff Meirelles various house plans. Afterwards, Meirelles had made an oral bid for furnishing such millwork and materials. At that time, the partners were thinking of obtaining millwork for 30 houses and estimates were made thereon. Since neither Curtis nor Good had a contractor's license at the time of the bids, and they were required to have a license to so operate, arrangements were made for Meirelles (who had a contractor's license) to supervise the construction of the houses. He did so between the time of the beginning of the operations in 1954 until August 1956, which supervision involved 30 houses, and he was to be paid at the rate of $50 per house. Meirelles also furnished materials for other houses built by the partnership after the first 30 houses were completed. Subsequently, Meirelles furnished materials to defendant Good after the partnership operation ceased, the cost of which materials was not charged against the partnership.

During this period, plaintiff Bartlett, a sheet metal and air conditioning contractor, furnished labor and material on these same houses built by the partnership. The first materials were furnished about November 22, 1954, and the last delivery was on April 28, 1957. During this period, both Good and Curtis were present at negotiations and Curtis was dickering to reduce prices. Curtis made some payments to Bartlett for his work on the houses built by Good.

Cason, assignor of plaintiff Pendergraft, furnished the partnership of Curtis and Good with plumbing supplies and labor used in the houses built by the partnership and gave Pendergraft an assignment of his claim dated November 1, 1957, totaling $2,230. This assignment was accepted by Good

on November 1. Pendergraft sent a statement to the partnership for the amount due on the assigned claim plus $251.38 for his charges for materials he had furnished direct to the partnership. A bill of particulars was served on the defendant Curtis on February 12, 1959. No issue was made concerning the amount of the claim of plaintiff Pendergraft at the trial. Counsel for appellant there stated: "The account of Mr. Pendergraft seemed to be in good order." In this case, as in the other two companion cases, some of the accounts were in the name of Good and some in the name of Robert B. Good Enterprises.

Good testified that he and Curtis began operating as partners on July 1, 1954, with the purchase of foundation forms from plaintiff Meirelles; that the boat was purchased and paid for by Robert B. Good Enterprises; that Curtis paid various items for Robert B. Good Enterprises out of his own funds and the business repaid him; that a partnership was discussed as early as 1954 and on February 8, 1955, a partnership agreement was drawn up and signed by both Good and Curtis and they operated as partners both before and after that time and while so operating as partners he constructed 61 houses and Curtis had an exclusive right to sell them; that Curtis received about $33,000 from the sale of houses over and above the amount he contributed, and that these plaintiffs furnished the material and labor indicated for the partnership operations; that Curtis withdrew from the venture and the partnership dissolved in the summer of 1957; that on May 28, 1958, he filed bankruptcy and in April 1958 he and Curtis talked about settling the partnership affairs, and that Curtis, upon being shown the partnership agreement, said it was not worth the paper it was written on; that no certificate of doing business under a fictitious name was filed by the partnership; that certain returns made did show Curtis as a partner and certain others showed Good as the sole owner and that a partnership income tax return was never filed.

Curtis testified he was a real estate broker; that after August 1954 he and Good decided to form a partnership but changed their minds; that they did sign an agreement in September 1954 and he never had a copy of it; that within six days after it was signed he and Good had an oral agreement that they would not be partners and they would continue under some other arrangement, and that Good owed him a considerable amount for money advanced.

## Findings

After hearing the evidence, the trial court found that no account stated had been established; that a partnership existed between defendant Good and Curtis; that they were operating under the name and style of Robert B. Good Enterprises; that the partnership began on or about July 1, 1954, and continued until May 1957 when it was terminated by mutual consent and agreement; and that during the existence of the partnership it became indebted upon the open book account, as pleaded, to plaintiff Meirelles for $9,745.01, without interest; to plaintiff Bartlett for $822.83, without interest; and to plaintiff Pendergraft for $2,481.38, plus interest on $251.38 of this amount at 7 per cent from December 1, 1957, to date of judgment, and interest on $2,230 (assigned claim) from December 22, 1958 (date action filed) to date of judgment.

Judgment was accordingly entered on April 29, 1960, against Robert B. Good Enterprises, a copartnership composed of Robert B. Good and Ed Curtis. It recited that execution would run against the copartnership and the individual property of both Good and Curtis. Defendant Curtis filed separate appeals in each case.

## Open Book Account

It is first argued on this appeal that the evidence was insufficient to show an open book account, since it could not be ascertained from the records introduced by plaintiffs that they were complete enough to supply evidence as to what amount was due claimant. (Citing 1 Cal.Jur.2d, § 7, p. 321.)

Suffice to say, over 750 pages of reporter's transcript were consumed in the trial of the actions. There was very little dispute as to the amount and price of material and labor furnished, and the records produced justified the finding of the trial court that these articles were furnished and that the amount found due was proper. (1 Cal.Jur.2d, § 7, p. 321, *supra*.)

In the Meirelles case, counsel for appellant Curtis stated: "We are in no position to put on any further evidence with respect to the account. We feel that on the basis of the accounting that they have given us this is a correct figure, on the basis of that accounting."

## Bill of Particulars

Some complaint is now made on appeal that an item of $1,500 for supervision was not contained in the bill of

particulars furnished appellant. The record indicates a stipulation that the bill of particulars could be so amended. Complaint is also made for the first time on appeal because the complaint was not amended accordingly. Apparently no objection was made at the trial or on the motion for a new trial in this respect. The stated sum allowed did not exceed the amount of the prayer. No prejudicial error resulted. (*Drullinger* v. *Erskine,* 71 Cal.App.2d 492, 497 [163 P.2d 48]; *Gerstner* v. *Scheuer,* 91 Cal.App.2d 123, 128 [204 P.2d 937]; *Gudelj* v. *Gudelj,* 41 Cal.2d 202, 212 [259 P.2d 656]; *Stein* v. *United Railroads,* 159 Cal. 368 [113 P. 663]; Code Civ. Proc., § 580.)

### PAYMENTS

Appellant also argues that certain payments made to plaintiff should have been applied to the payment of partnership debts and not to Good's individual debts. This evidence was considered by the trial court and its ruling thereon cannot be disturbed on appeal. Its rulings in reference to certain proof offered by appellant in this respect were authorized.

In the Bartlett case, it was claimed by appellant that a certain transaction between Good and Curtis paid this claim in full. The trial court found against appellant on this issue. The bulk of the Pendergraft claim was an assigned claim which was fully established. The court found that $251.38 of plaintiff's claim was due upon an account stated or an open book account and this finding has sufficient evidentiary support. In the event of a conflict in the evidence, the trial court's determination of the facts is conclusive, and all substantial conflicts must be resolved in favor of the findings. (*Seidenberg* v. *George,* 76 Cal.App.2d 306, 308 [172 P.2d 891]; *Estate of Russell,* 80 Cal.App.2d 711, 715 [182 P.2d 318].)

### EXISTENCE OF PARTNERSHIP

[██] A mere examination of the facts above related clearly justifies the finding of the trial court that a partnership did exist during the period indicated and that the claims of plaintiffs were contracted during that period. In the trial judge's written opinion he stated:

"Although defendant Curtis obviously tried to maintain the status of a dormant or silent partner insofar as the general public and third parties dealing with the partnership were concerned, the fact remains that he was actually a partner with the defendant Good at all times during the period

abovementioned. Hence, he cannot escape liability to each of the plaintiffs as creditors of the partnership. (37 Cal.Jur.2d 662.)''

This conclusion is substantiated by the evidence and supported by authorities such as *Singleton* v. *Fuller*, 118 Cal. App.2d 733, 740 [259 P.2d 687], where this court held:

'' 'The courts will not countenance contrivances for giving persons the whole of the advantage of a partnership, without subjecting them to the liabilities . . .' [and] 'It **is** the intent to do the things which constitute a partnership that usually determines whether or not that relationship exists between the parties.' [Citing cases.] In determining whether a relationship such as that of partners has been created, the courts are guided not only by the spoken or written words of the contracting parties, but also by their acts.'' (See also *Furlow P. B. Co.* v. *Balboa L. & W. Co.*, 186 Cal. 754 [200 P. 625]; 38 Cal.Jur.2d, § 172, p. 157; 37 Cal.Jur.2d, § 28, p. 577.)

Judgments affirmed.

Coughlin, J., concurred.