[Civ. No. 8592. First Appellate District, Division One.—August 12, 1932.]

PAUL A. BELSER, Appellant, v. AMERICAN TRUST COMPANY, Executor, etc., Respondent.

J. E. White for Appellant.

Heller, Ehrman, White & McAuliffe, McKinstry & Haber and Pierce Coombes for Respondent.

WOODWARD, J., *pro tem.*—This is an appeal from a judgment for the defendant in an action wherein plaintiff sought to obtain possession of an unrecorded deed of gift executed by his father, Julius Henry Belser, and found after the latter's death in a safe deposit box. The sole question involved is whether said deed was delivered by decedent to appellant.

Stripped of unnecessary minutiae, the facts are: During the month of April, 1925, appellant and his wife, Mary E. Belser, decided to purchase certain real property situate in the county of Alameda and described as lot 26 in block lettered "F", Lakewood Park, city of Piedmont. The purchase price of said property was $7,750, of which amount Julius Henry Belser paid $7,000 and appellant $750. Julius Henry Belser took title in his name and immediately thereafter appellant and his wife were given possession of and lived on the premises until Christmas, 1926, when marital differences arose resulting in a divorce. Shortly thereafter appellant moved to Honolulu, while his wife continued to occupy the property until the death of Julius Henry Belser, which occurred on April 18, 1930. When decedent's safe deposit box was opened there were found therein the gift deed in question, bearing date of October 19, 1926, and the following letter in the handwriting of appellant:

"October 20, 1926.

"My dear Father: I am mailing you today under separate cover the gift deed from you to me for the Ranleigh Way property which I have been keeping about me for some time. As I have no safe place to keep this will you please put it in your safe deposit box as I am afraid I might lose it or have it stolen some time on my work. Do not record this deed as yet for as long as my affairs are still unsettled from my past business experience I do not want any of these creditors to make any further trouble for me.

"Your loving son,

"PAUL."

On the ground that it is unsupported by evidence and contrary to his own "uncontradicted" testimony, appellant attacks finding number 2, which, in substance, is to the effect that Julius Henry Belser signed the deed in question without any intention to convey immediate title thereto, or

otherwise; that said deed was never delivered to Paul A. Belser, but was retained by the grantor in his own exclusive possession and control until the time of his death.

■ Before proceeding to discuss the testimony in detail it may be observed preliminarily that appellant did testify that there had been a manual tradition of the deed; or, in other words, that his father had personally handed him the instrument which he retained for twenty-four hours and then returned to his father, at the latter's suggestion, for safe-keeping only. It is patent, of course, that the trial court disregarded appellant's testimony entirely and the novel point is made that since appellant, not being a resident of this country, testified by deposition, the court was not afforded an opportunity to observe his demeanor as a witness and for that reason was bound by his uncontradicted statements.

As early as 1860 the Supreme Court of this state had occasion to pass upon the right of trial judges to reject testimony of an inherently improbable nature. In the case of *Blankman* v. *Vallejo,* 15 Cal. 639, 646, the court declared succinctly and incisively: "We do not understand that the credulity of a court must necessarily correspond with the vigor and positiveness with which a witness swears." In recent years, however, the statement of this rule most frequently quoted is found in the case of *Davis* v. *Judson,* 159 Cal. 121, 128 [113 Pac. 147], wherein the court says: "While it is the general rule that the uncontradicted testimony of a witness to a particular fact may not be disregarded, but should be accepted by the court as proof of the fact, this rule has its exceptions. The most positive testimony of a witness may be contradicted by inherent improbabilities as to its accuracy contained in the witness's own statement of the transaction; or there may be circumstances in evidence in connection with the matter, which satisfy the court of its falsity; the manner of the witness in testifying may impress the court with a doubt as to the accuracy of his statement and influence it to disregard his positive testimony as to a particular fact; and as it is within the province of the trial court to determine what credit and weight shall be given to the testimony of any witness, this court cannot control its finding or conclusion denying the testimony credence, unless it appears that there are no matters or circumstances which

at all impair its accuracy.'' (To the same effect: *Caldwell* v. *Weiner*, 203 Cal. 543 [264 Pac. 1100]; *California-Calaveras Min. Co.* v. *Walls*, 170 Cal. 285, 303 [149 Pac. 595]; *Blanc* v. *Connor*, 167 Cal. 719, 722 [141 Pac. 217]; *Estate of Tompkins*, 123 Cal. App. 670 [11 Pac. (2d) 886]; *Corcoran* v. *Ward*, 115 Cal. App. 180, 182 [1 Pac. (2d) 455]; *Cowan* v. *Hill*, 109 Cal. App. 656, 659 [293 Pac. 871].)

In the light of this rule it is manifest, of course, that we cannot control the court's finding denying credence to appellant's testimony unless there are no matters or circumstances which in any degree impair, or tend to impair, its accuracy.

Paul A. Belser testified that about a year and a half after the property had been purchased, he received the following undated letter from his father:

"Fairmont Hotel.

"Dear Paul. I had a talk with my lawyer and he told me to have you write me a letter saying that you were asking me to put this Gvt Deed in my safety box, so as to take care of it for you as you not having a safety box to take care of it he says that if that is not done and anything should happen to me your gift deed would be no good and would haft to be put through court and you could not get anything so you better send me that letter right away hope all are well and that you all are getting in shape. Send me also the name of the street you are now on or also the way to get there.

"With love to all.

"J. H. BELSER."

In connection with this letter, which was admitted in evidence, appellant testified that on October 20, 1926, two days after receiving the communication, his father called on him at his place of work and personally placed the deed of gift in his hands; that he put the deed in his pocket and after returning home from his work on said day wrote and mailed the letter signed ''Paul''; that he did not inclose the deed with the letter because he could not find a large envelope; that on the following day he mailed said deed to his father in San Francisco. So far as the evidence discloses, appellant did not communicate the fact of his father's visit to anyone, nor does he claim to have seen

the deed again until after the father's death. On cross-examination appellant was asked why he had stated in the letter that he had been keeping the deed "about me for some time", when in fact it bore date of October 19, 1926, and could not have been in his possession for more than twenty-four hours. Appellant's reply was that "the wording of the letter is no consequence", and that "some time is any time". It could scarcely be contended that this reply was convincing or unequivocal. If appellant had the deed in his possession at the time he wrote the letter, as claimed by him, his statement to the effect that he had been keeping the deed for some time called for an explanation. Furthermore, the witness admitted that just after his father's funeral he may have stated to Albert J. Callahan: "I wonder what my father did with the Piedmont property?" Further on in the cross-examination, we find these questions and answers: "Q. Do you remember telling Mr. Callahan at the time that this conversation took place which you state was on your way to the Ferry that you had put $1,000. in your father's property and you were going to get your money back? A. Yes, I do. . . . Q. Do you remember at the time this conversation took place between you and Callahan, Callahan's wife asked you that you must have a memorandum or paper of some kind to show your interest in the property? A. She never did. Q. Don't you remember that you answered her and said this that you had no such paper; this deal was naturally on a father and son basis? A. No, sir, I do not remember. . . . Q. Can you state positively you made no statement to Mrs. Callahan? A. No, I cannot state positively. Q. You may have made them? A. I may have." It may be observed parenthetically that these were singular statements to come from one who had received a deed of gift to real property and had returned it to the grantor merely for safekeeping.

With reference to the same conversation, Albert J. Callahan testified: "Paul said, 'What did my father do with the Piedmont property?' I told him—Oh, I thought for a minute before answering, and then I said, 'Paul,' I said, 'your father told me of that transaction', and I said, 'You lost all your equity in that because you failed to live up to your agreement with him,' and he came back and said, 'Well, I paid $2,000.00 into that property and I am going

to get it back.' I said, 'Why, Paul, you agreed when you were divorced in 1927 that you would have nothing further to do with that property, and you told your father that he could rent the property to your former wife for $35.00 a month,' and Paul said, 'Well, just before I left for Honolulu in 1928, my father told me that all he wanted to have out of the property was the money he had put into it, and that if he sold the property, then I would get everything over and above that.' '' According to this witness the appellant did not, during that conversation, make any allusion to the deed of gift but, on the contrary, declared he had asked his father for some writing ''but he wouldn't give me anything''.

While appellant's silence as to the existence of the gift deed, of which he must have known if he actually had it in his possession at one time, is not, standing alone, inconsistent with delivery, nevertheless his inquiry as to what his father had done with the property in question, his statement to Callahan that his father had freely talked of selling the property, together with other evidence and circumstances may, and doubtless did, cause the trial court to disbelieve his testimony and conclude that he never saw the gift deed until after the safe deposit box had been opened. We therefore cannot hold that there were no matters and circumstances in evidence which impaired the accuracy of appellant's testimony. ■ It was within the province of the trial court to determine what credit and weight should be given thereto. Nor does the fact that appellant testified by deposition alter or change the rule. A deposition is in character parol, and is to be given the same weight as oral testimony. (9 Cal. Jur. 426; 8 R. C. L. 1165.) Moreover, the manner in which a witness testifies is but one of the tests for truthfulness relied on by courts and partially enumerated in section 1847 of the Code of Civil Procedure. The testimony of a particular individual may in itself be so improbable, or rendered so improbable by other evidence, as to warrant rejection even though the trial court is not afforded an opportunity of seeing and hearing the witness.

■ This case, of course, does not turn on the question of whether there was a manual tradition of the deed. The physical act of passing a conveyance from grantor to gran-

tec, despite the popular belief of many laymen to the contrary, may be relatively unimportant. "Delivery" is a word of well-defined meaning in law and implies more than a mere change of possession. It is an indispensable concomitant of manual tradition that the grantor shall intend to divest himself of title. This rudimentary rule of law is clearly and simply set forth in the case of *Williams* v. *Kidd,* 170 Cal. 631, 638 [Ann. Cas. 1916E, 703, 151 Pac. 1]: "It is essential to the validity of a transfer of real property that there be a delivery of the conveyance with intent to transfer the title, and the true test under which delivery is to be determined is in ascertaining whether in parting with the possession of the conveyance the grantor intended thereby to divest himself of title. If he did, there was an effective delivery of the deed. If not, there was no delivery."

Even if the trial court had been bound by the categorical statement of the appellant that the deed had actually been placed in his hands, there would still be evidence to sustain the finding that there was no intention on the part of Julius Henry Belser to divest himself of title. The letter written by decedent to appellant is suggestive of an attempt to utilize legal form without regard to substance. It was written prior to the execution of the deed. The writer seemed deeply concerned with the disposition of the property in the event of death, and it may be fairly assumed that he executed the conveyance with that thought uppermost in his mind. It is significant that this letter states the kind and character of reply which the writer desired. And it may also be regarded as significant that no mention is made therein of decedent's intention to personally deliver the deed—an act which appellant says occurred two days later. The trial court may well have believed that the gift deed, together with decedent's letter and appellant's reply thereto, prove nothing more than a testamentary scheme wherein decedent made an abortive attempt to transfer his property, effective at death, without a present intent to divest himself of title or to place his deed beyond recall.

Decedent's acts and declarations prior and subsequent to the execution of the deed in question seem entirely consistent with the court's finding as to intent. Mrs. Mary

Sagehorn (appellant's former wife) testified that when the property was purchased in 1925 decedent declared he would take title himself in return for his $7,000, but would execute a deed of gift to appellant; that as long as he (decedent) lived the property would have to remain in his name, but at his death the witness or her children would get it without probate. Mrs. Sagehorn testified further that after her divorce she again discussed the property with decedent and was assured by him that if she continued her payments of $35 a month she could occupy the property as long as he lived; that she made such payments regularly out of her alimony and received receipts designating the payments as rent.

The witness Callahan testified that decedent became seriously ill in December, 1929, and that, accompanied by Mrs. Callahan, he visited him early one morning at which time the decedent was in tears and declared he should never have bought the Ranleigh property as ''Paul failed to live up to his agreement.'' ''Q. He said he bought the property? A. He bought the property. He loaned Paul $7,000.00. I asked him, 'As a mortgage, Grandpa?' He said, 'Oh, no; I haven't a mortgage. I have the property.' ''

Appellant complains that the court committed error in allowing Callahan, over his objection, to relate a conversation he had with decedent in December, 1929, and also in not sustaining an objection to the introduction of certain memoranda found among decedent's personal effects and tending to show his interest in the Ranleigh Street property.

We think the point is without substantial merit. Respondent should have laid a better foundation before offering the memoranda, although it is not suggested in appellant's brief that the book entries and other writings were not in the handwriting of decedent. It is true, of course, that when a grantor has parted with title to property his acts and declarations in disparagement thereof, made in the absence of the grantee, are inadmissible in evidence; but whenever in a particular action the issue itself is whether the grantor has parted with title, it is the settled rule of law in this state that his subsequent acts and declarations are admissible as bearing on the question of delivery. (*Fisher* v. *Oliver*, 174 Cal. 781, 788 [164 Pac. 800];

*Williams* v. *Kidd, supra,* at p. 648.) We conclude, therefore, that the evidence was pertinent to the issue and properly admitted.

It may be observed that the decision and judgment of the trial court are declared in the findings to be without prejudice to plaintiff to maintain such action as he may be advised, to establish any interest which he may have in the real property in question by reason of any contribution of money made by him as part of the purchase price thereof.

For the reasons herein stated, the judgment is affirmed.

Knight, Acting P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on September 10, 1932, and an application by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 10, 1932.