[L. A. No. 14502. In Bank.—December 23, 1935.]

In the Matter of the Estate of FRANK SPROSTON, Deceased. FRANCIS GODFREY SPROSTON, Respondent, v. L. B. LATTER, Executor, etc., et al., Appellants.

Leo F. Falder, Paul A. Tschirgi and Henry G. Bodkin for Appellants.

G. Harold Janeway and S. T. Hankey for Respondent.

SHENK, J.—The proponents appealed from a judgment setting aside the probate of the instrument theretofore admitted as the will of the decedent.

Frank Sproston died in Los Angeles on May 2, 1932, at the age of about seventy years. He left as his sole heir and next of kin his son, the contestant Francis Godfrey Sproston. He also left a will dated March 21, 1932, wherein he declared that he was a single man and whereby he bequeathed the sum of $500 to A. E. Cole, $500 to Mrs. A. E. Cole, a $600 note and trust deed to George Workman and the balance of his estate to the proponents, L. B. Latter and his wife. None of the legatees was related to him. The instrument named L. B. Latter as executor to serve without bond, and declared that any heir not named was intentionally omitted. The entire estate amounts to about $8,000. The instrument was admitted to probate on June 17, 1932, and thereafter in October, 1932, the decedent's son filed his petition for revocation of the probate thereof on three grounds of contest, viz., (1) that the instrument was not duly executed; (2) lack of testamentary capacity; and (3) that the decedent was subject to the undue influence of L. B. Latter and his wife which operated directly upon the purported testamentary act. A trial was had before the court sitting without a jury. The court found specifically that the decedent, by reason of advanced age and physical infirmities, was without ordinary understanding and incapable of transacting business; that the Latters stood in a confidential relationship to him and were instrumental in obtaining and participated in the preparation and execution of the purported will, which was the product of the undue influence of the Latters operating directly upon the alleged testamentary act, and that the execution of the instrument was not the voluntary act of the decedent. The court made no findings on the issues raised by the first two grounds of contest other than a general finding that the allegations of paragraph II of the second ground of contest, relating to mental incompetency, are true. The court apparently based its conclusions and judgment on the findings relating to the issue of undue influence. If the evidence sustains the findings on this issue it is apparent that they in turn are sufficient support for the judgment without specific findings on the other issues.

About the year 1885, in Manchester, England, the decedent married. Three months later he left for Australia, alone. He never again saw his wife, nor did he ever see the son who was the issue of the marriage, although the decedent in

1908 returned to England and attempted to locate them. The wife died in 1918. After his departure from England the decedent worked as a steward on ships and later as a waiter in San Francisco and Los Angeles. George Workman and Frank Rose, also waiters, had been friendly with the decedent for many years. For nine years while he lived in Los Angeles and practically continuously prior and up to the time of his death, the decedent boarded with Mr. and Mrs. A. E. Cole, also legatees. The Latters, the residuary legatees, had known the decedent for fourteen years.

There is no necessity to state in detail the evidence which gives support to the findings. We may note briefly that it discloses that for several years the Latters had importuned the decedent to make a will in their favor on the claim that he owed it to them, although the other persons mentioned herein who were his friends had been as kind to him as the Latters had been; and that Sproston had consistently expressed his intention not to make such a will, but that he intended to return to England some day and find his son.

In December, 1929, the decedent broke a leg and was taken to the hospital. He was discharged from the hospital, but from that time he showed marked physical and mental infirmities, was ill most of the time, and on March 16, 1932, was taken again to the hospital in what proved to be his last illness. He was visited nearly every day during his last illness by the Coles, Workman and Rose, and the Latters saw him practically daily. Witnesses testified that Sproston's conversation at that time was irrational and without sequence, and that frequently his mind wandered and he appeared not to know where he was; that he frequently asked where he was and insisted that he was not at the hospital, but that he was on a boat and that the nurses worked for him. During this period Latter made the arrangements for the decedent's care at the hospital and at a rest home to which he moved Sproston before his death, made out checks for him to sign, and, when the decedent was too weak to sign, wrote Sproston's name by his own on one check which was returned by the bank.

On the morning of March 21, 1932, Latter requested Dr. Tarnutzer at the hospital to send an attorney to draw a will for Mr. Sproston. Dr. Tarnutzer sent McCartney, an officer of a bank and an attorney on the inactive list. Latter intro-

duced him to the decedent and both the Latters remained in the room during the interview between Sproston and McCartney and while the will was being prepared and executed, except for a few minutes when Latter went on a search for an additional witness. Latter sat within hearing distance of the conversation between Sproston and McCartney. Sproston was sitting up in bed. McCartney wrote the will in his own hand and then gave it to Sproston to read. It was McCartney's testimony that Sproston told him to whom he wished to leave his property and that he wanted to leave the bulk of it to the Latters because they had been good to him; that it was at Sproston's request he inserted the clause respecting omitted heirs. Latter testified that during the preparation and execution of the will there were no other persons in the room except one Israelson who came into the room and was asked to sign as a witness with Mr. McCartney. Latter testified that he read the contents of the executed paper before McCartney left and took it with him, and his subsequent declarations indicate that he was familiar with its contents and that he had prevailed upon Sproston to make the will as he did because of their close friendship. Neither Dr. Tarnutzer, who attended Sproston, nor any of the attending nurses, were called as witnesses. Subsequently Sproston stated to Rose that he had made a will and that he did not remember much that was in it except that "you", indicating Rose, "and Mrs. Cole were mentioned". Rose in fact was not mentioned in the will. Sproston died on May 2d following. After his death Latter called on Mr. McCartney and obtained the will.

There is additional evidence tending to establish the childishness of the decedent's mentality and the wanderings of his mind during his illnesses following his first visit to the hospital in 1929; that in those periods the Latters took complete control of his affairs and his care and hospitalization; and that the Latters consistently pursued a fixed plan of obtaining by coercive measures the execution by Sproston of a will in their favor. The evidence, direct and circumstantial, strongly tends to prove that the Latters finally succeeded in overpowering the mind of the decedent against his expressed contrary intent. It follows that the findings of the court are sufficiently supported by the evidence. The record does not disclose such a set of facts which this court, giving to the

evidence all due intendments and favorable inferences in support of the judgment, will declare as a matter of law may not serve as a basis for the finding that the purported will was not the expression of the decedent's own desires and was not the product of the free agency of the decedent. Our conclusion from the record before us is that the findings of the court are fully supported even though the evidence that undue influence was exerted upon the purported testamentary act was circumstantial. (*Estate of Snowball,* 157 Cal. 301 [107 Pac. 598]. See *Estate of Anderson,* 185 Cal. 700, 708 [198 Pac. 407]; *Estate of McDevitt,* 95 Cal. 17, 33 [30 Pac. 101]; *Estate of Carson,* 74 Cal. App. 48, 61 [239 Pac. 364].) The record does not present merely a case of ''general influence not brought to bear directly upon the testamentary act'', which, in the case of *Estate of McDevitt, supra,* and cases following it relied on by the appellants, was held not to amount to undue influence. That the facts constitute proof that undue influence bearing directly upon the testamentary act was exerted in this case is indicated by the facts and the decision in the case of *Estate of Snowball, supra,* where at page 307, it was stated: '' . . . such proof exists where the evidence is of such a nature as to warrant the inference that the will was the direct result of the influence exerted for the purpose of procuring it and was not the natural result of the uncontrolled will of the testatrix''.

■ Even should we adopt the appellants' doubt cast upon the sufficiency of the evidence to support that portion of the findings that there existed a confidential relationship between the decedent and Latter, nevertheless the evidence otherwise amply supports the finding of the ultimate fact and the questionable sufficiency of the evidence as to the confidential relationship does not require or justify a reversal of the judgment.

■ The appellants contend that the court erred prejudicially in admitting evidence of the declarations of the decedent which were not a part of the *res gestae* or execution of the purported will. Those declarations were admissible, however, as tending to throw light on the mental state of the decedent and his feelings and attitude toward the Latters. Evidence in that respect was material on the issue of undue influence (*Estate of Snowball, supra; Estate of Anderson, supra*), and the court so expressly limited the purpose of the

testimony. We cannot say that the court was unmindful of the limited purpose of the evidence, and the record does not show that the declarations were made at a time too remote from the time of the execution of the instrument by the decedent, or that the court accorded to such declarations any undue weight. ▉ The appellants also assign as prejudicially erroneous the rulings of the court in admitting in evidence over the appellants' objection statements by Latter not made in the presence of his colegatee, Mrs. Latter, citing *Estate of Dolbeer,* 149 Cal. 227, 245 [86 Pac. 695, 9 Ann. Cas. 795]; *Estate of Dolbeer,* 153 Cal. 652, 662 [96 Pac. 266, 15 Ann. Cas. 207]; *Estate of Lavinburg,* 161 Cal. 536, 546 [119 Pac. 915], and similar cases. A sufficient answer is that the objection on that ground was not made at the time and may not be urged for the first time on appeal.

▉ It is urged that there was no evidence of lack of due execution nor any evidence that the decedent was mentally incompetent to make a will, and that the appellants were entitled to findings on all the issues raised by them. It may be assumed that the evidence is insufficient to support findings adverse to the proponents on those issues. But it does not follow that the omission to make findings thereon was prejudicially erroneous. A finding, if deemed essential, could be made by this court in favor of the proponents under the authority granted by section 956a of the Code of Civil Procedure. If the findings were so made, the findings on the issue of undue influence would still be sufficient to support the judgment.

The judgment is affirmed.

Thompson, J., Curtis, J., Langdon, J., Waste, C. J., Seawell, J., and Conrey, J., concurred.

Rehearing denied.