[Civ. No. 16649.   Second Dist., Div. One.   Jan. 6, 1949.]

Estate of MINNA SARA POHLMANN, Deceased.   WILLY POHLMANN, Appellant, v.   LUCIE   NASCHEL, Respondent.

Joseph Scott, J. Howard Ziemann and Cuthbert J. Scott for Appellant.

Joe Orloff and Morris J. Pollack for Respondent.

WILSON, J. assigned.—This proceeding was instituted by respondent Lucie Naschel to contest the probate of a document purporting to be a holographic will executed by decedent Minna Sara Pohlmann on February 14, 1941, while residing in Berlin, Germany. The instrument, which by its terms devised all decedent's property to proponent-appellant, was offered for probate by him as the last will and testament of decedent. The contest is on the ground of duress and undue influence alleged to have been exercised on decedent by proponent who was at the date of the will a resident of Cuba.

·Contestant and proponent are brother and sister and are the only heirs at law of decedent. The contest was tried by the court without a jury. Findings of fact were made in favor of contestant and judgment was entered denying the petition for probate of the alleged will, from which judgment proponent has appealed.

Appellant, referring to a statement in the memorandum opinion of the trial judge in which reference is made to the evidence that decedent was "a woman of some determination" and quoting from *Estate of Anderson,* 185 Cal. 700, 707 [198 P. 407], that "It is no easy thing to overpower the mind of a normal person in full possession of his senses by the mere pressure of importunities and entreaties," contends that it would have been improbable and well nigh impossible that at a distance of several thousand miles he could have exercised duress and influence on decedent to such an extent as to cause her to bequeath her estate in a manner that did not represent the free and individual expression of her desires.

How such a result as found by the court could have been accomplished, notwithstanding the distance separating the parties, can be better comprehended from the fact that decedent was of the faith that was under the condemnation of the political party then having dictatorial power in Germany. Her surviving son and daughter, the parties to this contest, are of the same religious belief. Decedent was living in Berlin at a time when thousands of persons were being murdered or deported to concentration camps for no other reason than that they adhered to that same belief. She yearned to avoid such a fate by coming to America. She desired and needed her son's assistance in escaping the persecution, pestilence and death daily surrounding her. Menaced as she was and living in expectation of the doom that had befallen so many others, the "pressure of importunities and entreaties" need not have been of such force in order to influence and coerce her as would have been necessary if she had been living in normal conditions and under a government that exercised its power in the manner of civilized nations.

The court found that decedent made a will which was written, dated and signed in her own handwriting, but that it was copied word for word from a document prepared by Willy and mailed to her for that purpose; that decedent could neither read, write nor understand the English language; that the will filed for probate was made and executed at the insistence and under the duress and through the influence

of Willy; that he induced and persuaded his mother to make and execute the will offered for probate and to disinherit Lucie by stating to decedent in numerous letters, telegrams and cablegrams that it was necessary that she execute such a will in order to enable him to assist her in leaving Germany and come to the United States; that decedent was an elderly woman who was under great mental strain by reason of her desire to escape from Germany and from Nazi persecution; that Willy took advantage of her mental condition and her great desire to leave Germany and caused her to believe that in order to do so it would be necessary for her to make a will leaving everything to him and to disinherit Lucie; that Willy threatened his mother that if she failed or refused to execute a will disinheriting Lucie and leaving the entire estate to him he would not bring her out of Germany, nor would he help her to leave that country; that decedent was susceptible to the influence, threats and suggestions of Willy, which were the basis for her making, executing and placing in the hands of Willy the will sought to be admitted to probate; that Willy poisoned the mind of his mother against Lucie through letters and cablegrams stating, among other things, that Lucie would not assist, or cooperate in efforts to bring decedent out of Germany; that Willy advised his sister Lucie that he had sent a permit for the entry of his mother into Cuba when in truth and in fact no such permit had been sent; that such advice was sent to Lucie for the purpose of lulling her into the belief that her mother would soon be able to leave Germany; that Willy did not want his mother to leave Germany for the reason that he would have no hold over her if she arrived in this country; that the will was executed under the duress, misrepresentation, fraud and undue influence of appellant Willy.

The only specification of error assigned by appellant is stated thus: ''There is no substantial evidence to sustain the finding of the trial court that the instrument offered for probate as the last will and testament of the decedent was procured by or through the undue influence of the proponent Willy Pohlmann.''

The court cannot set aside a will and leave the decedent intestate unless upon substantial evidence. ▉ On appeal the weight to be accorded the evidence and the province of the reviewing court are the same in a will contest as in any other civil case. ·(*Estate of Trefren,* 86 Cal.App.2d 139

[194 P.2d 574, 575]; *Estate of Bristol*, 23 Cal.2d 221, 223 [143 P.2d 689], and cases cited.)

Under this rule we must view the evidence in the light most favorable to respondent and resolve all conflicts in her favor. When one or more inferences can be reasonably deduced from the facts a reviewing court is without power to substitute its deductions for those of the trial court. If there is substantial evidence to sustain the conclusions of the trier of facts our power "begins and ends with a determination as to whether there is any *substantial* evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury" or by the court when the trial is without a jury. (*Estate of Llewellyn*, 83 Cal.App.2d 534, 543 [189 P.2d 822, 191 P.2d 419]; *Estate of Bristol, supra.*)

Since our power is thus delimited, we shall consider but not weigh the evidence. We shall analyze the evidence given in support of respondent's allegations in order to determine whether it answers the requirement of being *substantial*. An analysis of the evidence offered by appellant would serve no purpose since the task of weighing the evidence has been performed by the trial court and that is not one of our functions. The recital of evidence contradictory of that introduced by respondent will not be attempted inasmuch as neither such evidence, nor inferences that might be drawn therefrom, would cause a reversal of the judgment if respondent's evidence is *substantial*. (See *Estate of Llewellyn, supra.*)

Under the foregoing rules we shall examine the evidence offered in support of the contest to ascertain if it is of such substantiality as to sustain the findings and the judgment based thereon.

Decedent's age was 76 when the will was executed, and she was 78 years old at the time of her death in a concentration camp in Czechoslovakia. Adolph Pohlmann, husband of decedent and father of the parties to this contest, deserted his family and came to America in 1897. He never returned to Germany. Two of his brothers also came to this country. All three resided in Los Angeles. One brother died and left a substantial estate in trust, one-sixth of which was devised to Adolph. The latter died in 1939 leaving all his property to his wife Minna, and to his two children in equal shares if his wife predeceased him. Distribution was ordered to the widow in 1941. Only a small part was distributed and by reason of the war between the United States and Germany the remainder was seized by the Alien Property Custodian, sub-

ject to return in the manner provided by law upon application of the proper parties.

Contestant married Wolf Naschel in 1915 when she and her husband established their own residence in another portion of the city of Berlin from that in which decedent resided. She telephoned her mother daily and visited her about twice a week. Although she did not contribute to her mother's support, she made gifts to her of clothing and other articles. Before leaving Germany, and while Lucie and her husband were still residents of Berlin, Willy became involved in difficulties with the Gestapo and Lucie and her husband, at their personal risk, harbored him for 14 days in their apartment.

In 1938, Lucie's husband obtained a visa to Czechoslovakia and some time later Lucie obtained a visa to Switzerland. Thereafter they met in Switzerland and came to the United States, arriving in New York in November, 1938. When Lucie left Germany she did not say goodbye to her mother, nor did her husband. By reason of the conditions existing in Germany at that time they were advised by their lawyer not to talk to anybody about their impending departure.

Upon arriving in New York Lucie wrote her father but received no reply. In 1939, she came to Los Angeles where she discovered that he had been seriously ill and had died on January 1st of that year.

About a month after her arrival in Los Angeles Lucie began proceedings to bring Willie and her mother out of Germany. In February, 1939, she cabled Willy, "Applied for traveling papers for you, should I get the traveling papers for mother?" Willy wrote his sister, "Cable from 23 February received, for the time being don't apply for immigration papers for mother." He desired to leave Germany himself but wrote that it would be dangerous to obtain a visa for his mother at the same time.

Willy testified that no arrangements were made to obtain a visa for his mother because his father was working on the matter. He knew that his father was dead at that time. The offer of assistance was made by Lucie more than a month after her father's death. She expended approximately $1,000 in her efforts. Willy's knowledge of his father's death is shown by the fact that prior to his leaving for the United States Willy took his mother to the American embassy in Berlin and had an attorney prepare a power of attorney giving him practically complete control over the estate in dispute. Before drafting the document the attorney wrote to attorneys in Los

Angeles and secured information concerning Adolph's estate. This document was prepared and signed by decedent in Willy's presence. In testifying in court he at first denied he had known the purpose of the power of attorney but changed his testimony and admitted he knew it meant that he would "have to take care of everything that belonged to my mother."

Before leaving Berlin and after writing his sister not to obtain a visa for their mother, Willy told the latter he would "get her a visa so she can leave Germany." There is no evidence that he told his mother of Lucie's offer of assistance.

After arriving in Cuba, Willy advised Lucie that he had sent a visa to their mother, but in fact he had not done so. While in Cuba he made no effort to utilize the assistance of any of the Jewish organizations which might have aided in his mother's departure from Germany.

Willy testified he wrote his mother that Lucie was not spending any money or doing anything to assist her, although Lucie had previously written to Willy that at her instance attorneys in Los Angeles were trying to bring decedent out of Germany.

It thus appears that while Lucie was obtaining the visa for Willy, he opposed the obtaining of one for his mother and that he falsely represented to Lucie that he had sent a permit to his mother when he not only had not done so but was sending letters to his mother containing untruths about his sister. In those letters he stated Lucie had plenty of money, although he was at that time in Cuba and had no knowledge of her financial condition.

Appellant states that the power of attorney was executed by decedent to Willy out of respect to the wishes of her husband who had previously asked Willy to come to Los Angeles and assist in the management of his affairs. There is nothing in the record to indicate that Adolph ever expressed a desire that Willy should take charge of his mother's interests after Adolph's death or that he should manage the estate. Since in his will Adolph provided that his property should go to his two children in equal shares in the event his wife should predecease him, it may be presumed that if she was acting in response to her husband's wishes she would not have given Willy entire control over her estate. For the same reason it may also be presumed that she would have bequeathed the estate to the two children instead of expressly disinheriting Lucie.

Furthermore, it is clear that previously to the exercise and the taking effect of the influence of Willy on his mother and his threats to allow her to remain in Germany unless she complied with his demands, decedent intended that Lucie should share in her property and apparently Willy had led his mother to believe that he acquiesced in her desire. This is clearly indicated by a letter from decedent to Lucie dated April 12, 1940, in which she said: ''Now dear Lucie I have transferred to our Willy all right of disposition in writing and I have arranged it in such a way that Willy will not forget you financially; that is what our Willy has promised me.''

That at a later date Mrs. Pohlmann was induced to believe Willy's statements in disparagement of his sister is indicated by letters which she wrote to Lucie. For example in one she advised the latter to ''make friends again with your brother because he talks very badly about you. . . Willy writes me in every letter that you did not do enough for him in Los Angeles.'' She made similar statements in other letters to her daughter. Willy knew the reports made by him to his mother concerning Lucie were not justified by the facts. He knew Lucie and her husband had expended several hundred dollars in arranging for his departure from Germany and that she had obtained $4,000 from the estate of Adolph Pohlmann for the purpose of bringing their mother to the United States.

False representations constitute fraud if the evidence shows they were designed to and did deceive the testator into making a will different in its terms from that which he would have made had he not been misled, although there is no proof that they were used as pressure upon the mind of the testator. (*Estate of Newhall,* 190 Cal. 709, 718 [214 P. 231, 28 A.L.R. 778].) In the instant case the pressure on decedent's mind was of the strongest nature—she must do her son's bidding or he would permit her to die at the hands of their common enemy.

The evidence shows that the relations between Willy and his mother were not harmonious and that they quarreled frequently before he departed from Germany. Depositions of two witnesses were taken in Berlin. Erna Loewenstamm testified that after Willy left Berlin she saw documents sent by him to his mother, one of which was a will. The letters from Willy to his mother were shown by the latter to the witness. It was stated in one of the letters that ''he would be able

to get her out of Germany as soon as he is in receipt of the will making him sole heir.'' Decedent stated to the witness that her husband left her an estate in the United States; that ''her son then sent her forms of a will, making him sole heir, which she was to copy and sign and send back to him.'' The witness testified that decedent was very angry with her son at the time because he asked to be made sole heir and she was undecided what to do; that after weeks of consideration she decided to copy and send the will, believing that was the only means by which she could get to the United States. Decedent showed the witness a will in German and in English and showed Willy's letters from the United States. The witness read the will. Decedent said to her, ''I have to sign the will or else my son can't send me the necessary papers for my departure to the United States.'' The letters which the witness saw were signed by Willy Pohlmann and the witness knew they were in his handwriting.

Alexander Rothholtz testified by deposition that decedent talked to him about her son; that she said he wanted her to join him in the United States but it would be necessary for her to send him the papers giving him power of attorney and her will in which he would be designated as sole heir, otherwise it would not be possible for him to arrange for her departure from Germany. The witness saw a power of attorney and a will ''drawn up'' by Willy Pohlmann and a lawyer which were to be copied and signed by Mrs. Pohlmann and sent back to Willy as originals. Mrs. Pohlmann talked to the witness about the will. The witness said ''She was undecided if she would draw up her will as her son wished, making him sole heir. Seeing that it would be her only way out of Germany she signed it after much consideration.'' Decedent told the witness her son sent her forms of will for her to copy in her own handwriting and send back to him. Upon arrival of Willy's letter with the form of the will, decedent showed it to the witness and stated that ''she did not want to leave everything to her son, and she was very angry that her son asked this of her while she was still living.'' The witness saw the form of the will and knew its contents. Decedent was of the opinion, after receiving her son's letters and telegrams, that the execution of the will was the only possible way by which she could get out of Germany. The witness stated that the forms of will which he saw were the same as those referred to by Willy in his personal letters to his mother, all of which

decedent showed to the witness. The letters from Willy to his mother which the witness saw came from Cuba and the United States.

It is contended that the findings with reference to undue influence are not supported because, says appellant, it is "elementary that written interrogatories may not constitute the sole evidence supporting a finding of undue influence." No authority is cited for such contention. To the contrary, the rule is that it is within the province of the trial court to determine the weight of the evidence and the credence it shall receive whether given in the presence of the court or by deposition. A deposition is to receive the same consideration and to be given the same weight as oral testimony. (*Belser* v. *American Trust Co.*, 125 Cal.App. 344, 350 [13 P.2d 951].)

The statements made by decedent to the witnesses Loewenstamm and Rothholtz above related preceded the signing of the will which was not executed until "after weeks of consideration" by decedent. Such statements and the evidence thereof are therefore not within the rule on which appellant relies that " [a] testator cannot, *after the execution* of his will, impeach its validity by any statements of fact connected therewith," (italics added) and that a will cannot be "impaired in its validity and effect by afterthoughts." (See *Estate of Calkins*, 112 Cal. 296, 302-3 [44 P. 577]; *Estate of Gleason*, 164 Cal. 756, 761 [130 P. 872].) Such evidence was admissible not only for the purpose of ascertaining decedent's state of mind but in support of the charge of undue influence. The witnesses testified not only to declarations made to them by decedent but to facts coming to their personal knowledge through the reading of letters from Willy and the draft of the will which they recognized to be in his handwriting. Declarations of a testator are admissible to show his intention, feeling, belief or other mental state, whether made in the presence of an adverse party or not (*Estate of Carson*, 184 Cal. 437, 445 [194 P. 5, 17 A.L.R. 239] and cases cited) and such statements are to be given consideration for the purpose of throwing light on the mental state of decedent and his feelings and attitude toward the person named as legatee and on the question of undue influence. (*Estate of Hettermann*, 48 Cal.App.2d 263, 272 [119 P.2d 788].) Moreover, the record discloses that the depositions of the witnesses were read without objection having been made by appellant

to the questions which elicited the evidence of the complaints made by decedent concerning Willy's attitude and conduct. Since no objection was made in the trial court appellant cannot assign error on appeal that the evidence was erroneously received. In fact no such assignment of error has been made in this court. ■ Incompetent evidence admitted without objection is sufficient to support a finding (*Powers* v. *Board of Public Works*, 216 Cal. 546, 552 [15 P.2d 156] and cases cited) and may be considered by the court with other evidence on the subject. (*Dorfer* v. *Delucchi*, 61 Cal.App.2d 63, 66 [141 P.2d 905] and cases cited.)

The will offered for probate consisted of two parts, one written in English, the other in German. When each is translated into the other language they are found to be duplicates. They were offered as, and have been considered to be, one will.

One of proponent's witnesses, a translator for 30 years and an interpreter for 10 years of English and German, testified that in his opinion the instrument in the German language is a translation from English into German. He stated: "it seems that the will was first written in English. Then it seems the translation from the English into German by one who laid more stress to literal translations than colloquial expression." When asked the reason for his opinion that the translation was from English into German, the witness said: "It is because in the English version is in what we may consider not only good English but also following the ordinary phraseology of a will in legal language, whereas the German attempts to follow almost literally that very English version. For two reasons, one, because colloquialism has it that no two languages can be translated literally in every case, partly because of idioms and partly because of grammar and syntax. This attempt makes it clear, or rather strongly indicates that someone endeavored to translate the English will into German, closely following the English wording and phraseology, to the effect that the German emanating from it is not entirely correct."

The document was unquestionably prepared by a lawyer in California or in any event by one familiar with the requirements of the California law. It is written in legal phraseology not familiar to a layman. There is evidence of a previous will of decedent leaving all her property to Willy, executed while he was in Cuba in 1939, but not specifically mentioning Lucie. The inference is that when Willy obtained legal advice in

California he found the will did not answer his purpose because Lucie would have received her share of the estate, notwithstanding the will, and he had one prepared that would be valid under the California statute.

■ There is no evidence that any other will was prepared by decedent in 1941 and it must therefore be presumed that in the evidence of Loewenstamm and Rothholtz, wherein they stated they had seen a will in Willy's handwriting, they referred to the will involved in this contest. Since the credibility of witnesses is a matter for the trial court, and the court relied on the truth of the evidence of Loewenstamm and Rothholtz the findings that the will in question was procured by undue influence, though based in part on evidence given by deposition, will not be disturbed by a reviewing court.

■ It is established by the evidence that decedent could neither read nor speak English but she was able to copy accurately a document written in the English language. Proponent offered the two documents, the German and the English texts, as the holographic will of decedent. Since (1) she was unable to read the document written in the English language; (2) the English version is in her handwriting; (3) the German text is a literal translation of the English copy without the phraseology and idioms of the German language; (4) the witnesses Loewenstamm and Rothholtz each saw in decedent's possession a draft of a will that they knew to be in Willy's handwriting, the inference is that he had the document prepared, wrote it himself in both English and German, translating it literally, and sent it to his mother so that she could copy each version verbatim.

In addition to the fact that the document conforms to the requirements of the California statute by mentioning both children of decedent, whereas a preceding will did not mention Lucie and by reason of such omission would not have been successful in disinheriting her, there is other evidence that it was prepared here and not in Germany. Had it been drafted in Germany it is presumed it would have conformed to the German law, but it is not in the form necessary to its validity in that country. The portions of the German Civil Code relating to wills was introduced in evidence and translated. That portion relating to disinheritance provides: "A testator may deprive a descendant of his compulsory portion (1) If the descendant makes an attempt against the life of the testator, or of his spouse, or of any of his descendants;

(2) If the descendant has been guilty of wilful corporal ill-treatment of the testator or his spouse; in the case of ill-treatment of his spouse, however, only where the descendant is also descended from such spouse; (3) If the descendant has been guilty of any crime, or any serious wilful offense against the testator or his spouse; (4) If the descendant maliciously commits a breach of his statutory duty to furnish maintenance to the testator; (5) If the descendant leads a dishonorable or immoral life contrary to the testator's wishes." The German Civil Code further provides that the ground for deprivation of a compulstory portion "must exist at the time of making the disposition *and must be stated therein*. The burden of proving the existence of such ground is upon the person who sets up the deprivation."

The will here in question does not conform to the requirements of the German Civil Code in that it does not state any of the reasons or conditions which authorize the disinheritance of a descendant. There is no evidence to indicate that any of the aforesaid reasons existed for the disinheritance of Lucie. The presumption is inescapable that the will was not prepared in Germany, and by reason of the fact that it conforms to the California statute, and the previous will did not, it is presumed that the will now before the court was prepared in California at the instigation of appellant.

Willy's testimony that he did not know his mother had made a will until he received it is completely contradicted by the direct and circumstantial evidence hereinbefore outlined. He denied some of the statements made by other witnesses and there was evidence in his behalf contrary to that which we have above related. However, all the evidence in the case has been placed in the balance and weighed by the trial judge. The evidence of the proponent of the will need not be stated since our only duty is to determine the substantiality of the evidence upon which the court based its findings.

Without question the evidence is substantial that by letters and cablegrams Willy caused his mother to believe that she would not be able to depart from Germany until she executed a will making him her sole heir; that he poisoned his mother's mind against his sister Lucie by false statements and innuendos; that he led Lucie to believe he was endeavoring to bring his mother out of Germany when he was making no effort so to do, although there were Jewish organizations in Cuba that would have given their aid if he

had requested it; that all other findings of fact find ample support in the record. The evidence shows the exertion of a pressure sufficient to overpower the mind and volition of decedent in the situation in which she was at the time of the execution of the will.

It is undisputed that Willy wrote letters to his mother in disparagement of Lucie. This is evident from the fact that decedent wrote to the latter making such statements as "make friends again with your brother, because he talks badly about you."

Undue influence may be proved by circumstantial as well as by direct evidence. (*Estate of Sproston,* 4 Cal.2d 717, 720 [52 P.2d 924]; *Estate of Miller,* 16 Cal.App.2d 154, 167 [60 P.2d 498]; *Estate of Snowball,* 157 Cal. 301, 314 [107 P. 598].) In the Snowball case the court said an unjust will does not of itself raise the presumption of undue influence but the nature of the will may be considered as a circumstance upon the issue of undue influence.

The statement in *Estate of Graves,* 202 Cal. 258, 262 [259 P. 935] may be considered to have been prophetically made to fit the instant case. Three well-established facts indicative of undue influence or a subversion of decedent's volition stand out clearly in the record: (1) The relations between Willy and his mother afforded him an opportunity to control the testamentary act; (2) decedent's condition was such as to permit of a subversion of her freedom of will; (3) proponent was active in procuring the execution of the instrument. The effect of the probative force of these facts in combination "is to impose upon the proponent the obligation of presenting evidence of volition and to make the question as to undue influence one of fact" for the determination of the trier of facts. (*Idem.* p. 262.) As said in the Graves case, "it clearly appears that the appellant took an active part in securing the execution of the will at a time when there existed a confidential relation between himself and" the testatrix. Added to the circumstances in the Graves case is decedent's daily peril and her state of mind engendered by fear of the Nazis and her son's insistence that she make him her sole heir before he would come to her aid.

Proponent in this language concedes in his brief that "a confidential relationship existed between Willy and his mother; first, as a result of their intimate blood relationship; second, because he was her attorney in fact." Willy's activity in the

preparation of the will and in inducing his mother to execute it is amply shown by the evidence which we have related. His undue profit from the will is obvious from the fact that through his activity and his influence on his mother when she was in dire distress and in danger of losing her life he induced her to leave her entire estate to him when his sister, one of the natural objects of decedent's bounty, would have received half of the estate had it not been for his acts.

Appellant says his research has failed to disclose a single decision wherein the claim of "activity" was advanced against a person so far removed from the scene of the execution of the will as disclosed by the record in the instant case. It may well be that no will was ever before executed under such circumstances as are shown by this record and that never has such an opportunity been presented for the overpowering of an elderly person's volition. Never before in history has a mass of people been held in fear of death solely because of their religious belief. In order to exert undue influence it is not necessary that the beneficiary of that influence be in the presence of the testator if the circumstances are such that pressure may be exerted by means other than oral persuasion. Mere absence of the beneficiary "does not, as a matter of law, overcome the inference of undue influence which may be drawn from the other facts" established by the evidence. (*Estate of Hettermann*, 48 Cal.App.2d 263, 273 [119 P.2d 788], and cases cited.)

The state of mind of Mrs. Pohlmann was such as to render her an easy prey to her son's repeated statements that it would be necessary that she make him her sole heir as a price for his making it possible for her to escape from the Nazi rule. Pressure was brought to bear directly upon the testamentary act by the behavior and threats of appellant though he was not present when the will was written and signed by his mother.

It is evident from decedent's letters to both Willy and Lucie that, although she had once thought enough of Lucie's husband to provide a dowry of 10,000 marks at the time of their marriage, she had no affection for him after the Naschels came to America. Notwithstanding this fact she did not indicate any ill-feeling toward Lucie, but was affectionate until after Willy had poisoned her mind by statements about his sister which were false and which he knew had no foundation in fact. In May, 1939, decedent wrote to Lucie acknowl-

edging receipt of "your dear letters" and saying "I will not sign anything and that I will not give anyone any power of attorney." In April, 1940, she wrote the letter to Lucie hereinbefore quoted, showing that it was not her intention to disinherit her daughter but that she intended and expected the latter to receive her share of the estate, saying that she had transferred the disposition of her property to Willy and that he "will not forget you financially; *that is what our Willy has promised me.*" This letter is evidence not only of decedent's affection for Lucie and of her desire that after her death the latter should share in her property but of Willy's promise to his mother of fair dealing with his sister— a promise that he did not intend to fulfill. At the same time he was scheming to obtain the entire estate for himself.

In his opinion the trial judge referred to decedent's letters that contained unfavorable comments about Lucie's husband, showing that he had considered and weighed that evidence in connection with all other evidence in the case. Since the trial judge had performed his duty, and upon conflicting evidence had reached the conclusions recited in the findings of fact which are based on the entire record, it is beyond the power of a reviewing court to give such emphasis to these letters as to make them paramount to the great mass of evidence that sustains the trial court's findings. So to do would transcend our jurisdiction and would transform this court from its status as a reviewing court into a trial court.

The will executed in May, 1939, in which decedent devised all her property to Willy, but not expressly mentioning Lucie, was written in perfect English. Since it is uncontradicted that Mrs. Pohlmann could neither read nor write the English language it is manifest that she did not write it without the knowledge of any other person but that the document was prepared in English by another and copied verbatim by decedent. The trial court had a right to draw the inference from the evidence that the instrument was prepared at Willy's instigation.

Contradictory statements made by Willy while testifying and the evasive character of some of his testimony justified the court in disbelieving any of his evidence. He changed many of his answers when confronted with documentary or other evidence contrary to his previous testimony and admitted that letters to both Lucie and his mother contained falsehoods. One example is his letter to Lucie from Havana, dated

May 27, 1939, in which he said he had sent a permit to his mother ''via air mail and registered.'' On the witness stand he admitted he had not sent the permit and that his statement to Lucie was false. We have previously referred to his admission that he made no effort whatsoever to obtain such permit and never sought the help of Jewish organizations in Cuba that would have aided him if he had so requested. Other admissions of his having made untrue statements to his mother and to Lucie appear in the record.

For obvious reasons no letters from Willy to decedent were obtainable as evidence. Further justification for the inference that the 1939 will was executed at Willy's behest and insistence is found in the fact which cannot be regarded as a mere coincidence that the will is dated in the same month in which Willy wrote to Lucie that he had sent the permit to his mother. If he made the statement to Lucie which he admits was false, can it not be inferred that he made a similar statement to his mother in order to induce her to execute the will?

The record is devoid of evidence that anything occurred to cause decedent to lose the affection for her daughter that is indicated in her earlier letters. The reason for the change in her attitude and feeling was inferred by the trial judge from decedent's letters, in one of which she told Lucie that Willy ''talks very badly about you.''

Willy's conduct amounted to more than ''pressure of importunities and entreaties.'' He knew his mother's daily peril —a peril that he had escaped through Lucie's assistance. While his life and freedom were assured by his escape from a Nazi-ridden country, his mother faced death or imprisonment that was worse than death. His demands were not ''importunities and entreaties,'' they were threats that he would allow his mother to remain where he had left her when he fled to safety unless she acceded to his demand that she make him her sole heir. His activity in inducing the execution of the will is amply shown by the evidence and the inferences that may be reasonably drawn therefrom and that the trier of facts did draw. His undue profit is manifest.

Since the danger surrounding decedent was not ephemeral but the hand of death was constantly over her, the undue influence that caused her to execute the will existed at the very time of its execution.

The only assignment of error is the insufficiency of the evidence to sustain the findings of the trial court. It is manifest from the foregoing statement of facts and discussion of

the applicable law that the evidence is not only substantial but is sufficient and satisfactory.

Judgment affirmed.

York, P. J., concurred.

WHITE, J.—I dissent. Conceding the falsity of the representations of the proponent to his mother as set forth in the majority opinion, I am impressed that there is present in the record no substantial evidence that they were designed to and did deceive the testatrix into making a will different in its terms from that which she would have made had she not been misled.

The record conclusively and without contradiction shows that here was an estrangement between testatrix and her daughter. That it existed some months before the execution of the will here in question is attested in a letter dated October 31, 1940, from the testatrix to her son, proponent herein, introduced into evidence, and in which she writes: "If Lu leaves this scoundrel, divorcing him, I would think of her in my will, but not this way!!! After I am dead they will contest everything." In another letter from decedent, dated January 14, 1941, a definite estrangement between her and her daughter is indicated by the following excerpt therefrom: "I, too, think no longer about Lu; I am sorry to say that I have become resigned to this, she wants it that way. I have not written any more for months, nor did I congratulate her on her birthday, and on my birthday I did not get a single line from her. . . ."

In another letter, dated October 31, 1940, prior to the execution of the will now before us, and addressed to her brother-in-law, Rudolph Pohlmann, decedent wrote: ". . . I am also very satisfied and happy that my son Willy is now there and that he often comes to see you. Yes, dear Rudolph, you can have *full confidence* in my son!! But only to my son, *not to my son-in-law*. I have had much to go through with my son-in-law already and I have given my son-in-law very much what I had acquired through hard work. By means of a great stratagem he married my dear Lucie and then I also had to give him 10,000 marks outside of that. My daughter used to be a good daughter, decent person, who was much *too good* for this *scoundrel*!! I don't wish to tell you everything which my son-in-law has done by way of causing worries to me and his wife!!! . . . My son-in-law is not to concern

himself about my affair nor my daughter, only my son Willy who has also my *power of attorney* in his hands which my son did *not extort* from me but which I have given my son of my own volition. . . .''

While an appellate tribunal may not weigh the evidence, it must review and consider the same to determine whether, on its face, it may justly be held that it is sufficient to support the ultimate issue involved, in which case it is not a review of a question of fact, but purely one of law. Upon a reviewing court is cast the burden of determining whether there is any *substantial* evidence, contradicted or uncontradicted, to support the findings made. As was said by Mr. Justice Schauer, speaking for the court in *Estate of Bristol,* 23 Cal.2d 221, 223 [143 P.2d 689] : ''The critical word in the definition is *'substantial'*; it is a door which can lead as readily to abuse as to practical or enlightened justice.''

Neither must it be forgotten that the law presumes that a person is innocent of crime or wrong (Code Civ. Proc., § 1963, subd. 1), and that presumption must be overcome by him who alleges improper conduct. Evidence of the facts and circumstances, taken together, must amount to proof of fraud, and not to mere suspicion thereof. As was so cogently stated by Mr. Justice Carter, in a vigorous dissenting opinion in *O'Bryan* v. *Superior Court,* 18 Cal.2d 490, 501 [116 P.2d 49, 136 A.L.R. 595] : ''It is a matter of common knowledge that charges of fraud and undue influence are easy to make and difficult to prove, and a review of the cases involving such charges which are reported in the decisions of this and the appellate courts of this state discloses that substantial evidence must be produced by a contestant in order to invalidate a will on either of these grounds.''

The trial court characterized the testatrix as a woman who ''appears to have been a woman of some determination.'' As was stated by this court in *Estate of Llewellyn,* 83 Cal. App.2d 534, 561 [189 P.2d 822, 191 P. 2d 419], a will ''may not be held invalid on the ground of undue influence unless there be an actual showing of some sort of pressure which overpowered the mind and mastered the volition of the testator at the very moment of execution of the will.'' And it is no easy thing, by mere pressure of importunities and entreaties to overpower the mind of a normal person in full possession of his or her senses. On the issue of undue influence a factor to be considered is the mental condition of the decedent. (*Estate of Teel,* 25 Cal.2d 520, 522 [154 P.2d 384].)

No useful purpose would be served by discussing the comparatively few decisions of the appellate tribunals of this state in which an order setting aside a will for undue influence has been upheld. Suffice it to here quote what was said by this court in *Estate of Llewellyn, supra,* at page 555: "The evidence in the case now engaging our attention is very much weaker than that held insufficient to justify the setting aside of the wills in other cases decided by the appellate tribunals of this state. For support of this statement it is necessary to do no more than to cite the following authorities: *Estate of Perkins,* 195 Cal. 699 [235 P. 45]; *Estate of Clark,* 170 Cal. 418 [149 P. 828]; *Estate of Chevallier,* 159 Cal. 161 [113 P. 130]; *Estate of Purcell,* 164 Cal. 300 [128 P. 932]; *Estate of Casarotti,* 184 Cal. 73 [192 P. 1085]; *Estate of Finkler,* 3 Cal.2d 584 [46 P.2d 149]; *Estate of Garvey,* 38 Cal.App.2d 449 [101 P.2d 551]; *Estate of Schwartz,* 67 Cal.App.2d 512 [155 P.2d 76]; *Estate of Kendrick,* 130 Cal. 360, 363 [62 P. 605]; *Estate of Rich,* 79 Cal.App.2d 22 [179 P.2d 373]; *Estate of Russell,* 80 Cal.App.2d 711 [182 P.2d 318]."

It is not the failure to properly apply the rule of conflicting evidence that in my opinion has resulted in the reversal of the large number of verdicts and decisions upsetting wills, but because in will contests, more than in any other class of cases, triers of fact are prone to render verdicts and decisions upon insufficient and unsubstantial evidence, overlooking the established rule enunciated by this court in *Estate of Schwartz,* 67 Cal.App.2d 512, 520 [155 P.2d 76], as follows: "What others than the testator may think as to the justice or injustice of a will is simply a matter of opinion and therefore, before the law will permit judges or juries to make disposition of a decedent's property irrespective of his or her desires, substantial evidence is required to show lack of testamentary capacity at the time of the execution of the will."

The majority opinion attaches considerable weight and importance, as did the trial judge, to the testimony which appears in the form of written interrogatories addressed to two. residents of Berlin, Germany. Such testimony is epitomized and quoted from in the majority opinion. As to the sufficiency or substantiality of this evidence to establish undue influence on the part of the proponent, I quote from the case of *In re Calkins,* 112 Cal. 296, 300 [44 P. 577]: "To the extent that these declarations at or prior to the making of the will, . . . afforded any evidence bearing upon the state of the testatrix's mind . . . they were properly admitted, and were entitled to

consideration by the jury; but, *to the extent that they purported to be declarations of the acts of others, or of her own acts, they were but matters of hearsay merely,* whose truth rested in the veracity of the utterer, and upon which there was no opportunity of cross-examination or of explanation by the party who had uttered them, and *were not entitled to any weight by the jury, and cannot be considered for the purpose of sustaining their verdict.''* (Emphasis added.)

While this testimony was admissible to ascertain the state of mind of the decedent, it is totally insufficient to sustain a finding of fraud. (*Estate of Peterson,* 13 Cal.App.2d 709, 714 [57 P.2d 584].)

It must be conceded in the case at bar that a confidential relationship existed between the proponent and his mother, first, as the result of their blood relationship; secondly, because he was her attorney in fact. However, there is not shown that strict concurrence of each of the following three factors, none of which standing alone has the effect of creating a presumption against the validity of a testamentary document: (a) a confidential relation between testatrix and beneficiary, coupled with (b) activity on the part of the latter in the preparation of the will, and (c) the beneficiary unduly profiting thereby. (*Estate of Llewellyn, supra,* p. 563.) Respondent did not sustain the burden cast upon her in the lower court and has not satisfied me that the evidence was sufficient, as a matter of law, in view of the confidential relation between the proponent and the testatrix, to arouse a presumption of undue influence, thereby shifting to appellant the burden of showing that the will was not induced by coercion or fraud.

It is also extremely important to bear in mind that as far back as May 17, 1939, more than two years prior to the execution of the will here in question, decedent, without the knowledge of anyone, so far as the record discloses, wrote out and executed the first holographic will, wherein she bequeathed all of her estate to appellant. Viewed in the light of the decedent's attitude toward her daughter because of the latter's marriage, as reflected in the former's letters hereinbefore set forth, an impelling reason arises as to why in her previous will decedent left all of her estate to appellant. Furthermore, inasmuch as decedent's holographic will of February 10, 1941, herein offered for probate, differs in no way from her original holographic will executed May 17, 1939, excepting expressly to disinherit the respondent, the record herein is

uncontradicted that it was decedent's free and uninfluenced intention long before the execution of the will herein offered for probate to leave her entire estate to appellant. Thus the document presently under attack constitutes a complete confirmation of the decedent's wishes as expressed some two years previously (*Estate of Stump,* 202 Cal. 308, 310 [260 P. 543]), and establishes the existence of a definite pattern with respect to her testamentary intentions and desires (*Estate of O'Callaghan,* 82 Cal.App.2d 108, 116 [185 P.2d 659]).

It is indelibly written into our law that no person who is competent to make a will is called upon to "consult or satisfy the wishes or views of juries or courts" (*Estate of Nolan,* 25 Cal.App.2d 738, 740 [78 P.2d 456]). Neither is he obligated to bequeath his estate "in such a manner as to gain the approbation of his contemporaries, the wise or the good" (*Estate of Moorehouse,* 64 Cal.App.2d 210, 216 [148 P.2d 385].) That being so, the testatrix, being of sound mind, was entitled to dispose of her property as she saw fit, "not in equal proportions to his relatives or to those who would inherit under the laws of succession in case of intestacy (*Estate of Llewellyn, supra,* p. 566).

The right of people to dispose of property by will would have but little significance if that right may be legally disregarded whenever the testator has not disposed of his property in a manner which conforms to the views of a court or jury.

I would, therefore, reverse the judgment and remand the cause with directions to the court below to enter judgment admitting to probate the will executed by decedent dated February 10, 1941, and issue to appellant letters of administration with the will annexed.

A petition for a rehearing was denied January 24, 1949. White, J., voted for a rehearing.

Appellant's petition for a hearing by the Supreme Court was denied March 3, 1949.